UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH PEPICELLI,<br>      Plaintiff,<br><br>v.<br><br>EVERETT POLICE DEPARTMENT,<br>CITY OF EVERETT,<br>POLICE CHIEF STEVEN MAZZIE,<br>and LIEUTENANT NEIL BURKE,<br>      Defendants. | )<br>)<br>)<br>)<br>)  C.A. No. 1:23-cv-12406-MPK<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S APPENDIX

| Exhibit No. | Document | Page No. |
|---|---|---|
| 1 | Complaint and Demand for Jury Trial | PA-1 |
| 2 | Defendant Lieutenant Neil Burke's Responses to Plaintiff's First Request for Admissions | PA-16 |
| 3 | Defendant Police Chief Steven Mazzie's Responses to Plaintiff's First Request for Admissions | PA-27 |
| 4 | E-mail from Everett Mayor to Chief Mazzie | PA-45 |
| 5 | Memoranda from Plaintiff, Defendant Burke, and Captain Paul Hamilton related to incident | PA-47 |

PA-1

# Exhibit 1

COMMONWEALTH OF MASSACHUSETTS

Middlesex County, ss.                                    SUPERIOR COURT DEPARTMENT
                                                        CIVIL ACTION NO:

|  |  |
|---|---|
| JOSEPH PEPICELLI | ) |
|  | ) |
| Plaintiff | ) |
| v. | ) |
|  | ) |
| EVERETT POLICE DEPARTMENT, | ) |
| CITY OF EVERETT, | ) |
| POLICE CHIEF STEVEN MAZZIE, | ) |
| And LIEUTENANT NEIL BURKE | ) |
|  | ) |
| Defendants | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

This is an action brought by Plaintiff, Joseph Pepicelli, ("Plaintiff" or "Mr. Pepicelli") against his former employer Everett Police Department ("Defendant" or "Everett PD"), the City of Everett ("Everett"), Chief Steven Mazzie ("Mazzie"), and Lieutenant Neil Burke ("Burke") (collectively, "Defendants") for discrimination based on disability and heritage, as well as retaliation in response to the Plaintiff reporting such discrimination to an elected official. As a result of Defendants' actions, Plaintiff has suffered severe emotional distress, physical damages, and other compensatory damages, and lost wages and benefits. In support of this Complaint, Mr. Pepicelli avers as follows:

1

### I.   JURISIDICTION AND VENUE

1. The Middlesex Superior Court has jurisdiction over the claims asserted herein pursuant to M.G.L. c. 212 § 3.

2. Venue is proper in Middlesex County pursuant to M.G.L. c. 223.

### II.   PARTIES

3. Plaintiff, Joseph Pepicelli, is an individual residing at 115 Pemperton Street, Revere, MA 02151.

4. Defendant, Everett Police Department, is a municipal agency with an address of 55 Elm Street, Everett, MA 02149.

5. Defendant, City of Everett, is a municipality located in Middlesex County with an address of 484 Broadway, Everett, MA 02149.

6. Defendant, Police Chief Steven Mazzie, is an individual residing upon information and belief at 5 Cutter Lane, Unit 50, Building 16, Amesbury, MA 01923.

7. Defendant, Lieutenant Neil Burke, is an individual residing upon information and belief at 59 Ridgewood Lane, Melrose, MA 02176.

### III.   FACTUAL ALLEGATIONS

8. Mr. Pepicelli began working for Everett PD on July 24, 2006 as a Patrol Officer.

9. On February 2, 2015, Mr. Pepicelli fell on snowy steps at a residence in Everett while responding to a police call and suffered injury to his shoulder and arm.

10. These injuries resulted in a surgery for a torn rotator cuff, labrum, supraspinatus, bicep tendon, and damage to the acromioclavicular joint.

11. At the time, the surgeon chose to debride the bicep tendon, but stated that if the tendon tore further, he would need to do a full tendon repair.

12. Mr. Pepicelli submitted a claim seeking benefits pursuant to M.G.L. c. 41 § 111F for this injury and subsequent surgery which claim was approved.

13. Approximately two years later, on March 13, 2017, Mr. Pepicelli fell in the station parking lot on ice, striking his neck and back, an event which was caught on video.

14. Chief Steven Mazzie denied benefits based on this event even after video tapes were pulled evidencing the fall.

15. As a result of the fall, Mr. Pepicelli began receiving physical therapy and submitted a claim seeking benefits pursuant to M.G.L. c. 41 § 111F for a reoccurring injury.

16. When he was denied benefits by Chief Mazzie, Mr. Pepicelli contacted Mayor Carlo DeMaria and explained the situation.

17. Mayor DeMaria approved the claim, allowing the City of Everett to pay for Mr. Pepicelli's medical bills related to his injuries on the job.

18. In 2019, while Mr. Pepicelli was receiving physical therapy, Dr. Amanda Tetreault came into the waiting room to inform him that his case number for the City of Everett was not working anymore.

19. Mr. Pepicelli then found out that Chief Mazzie had caused the coverage to stop and denied knowing anything about Mr. Pepicelli's injuries.

20. During this time, the City of Everett's insurance had changed from Cook and Company to Meditrol.

21. When Mr. Pepicelli contacted Meditrol, he was told that they had no information about his injuries.

22. Mr. Pepicelli then contacted Cook and Company, who stated that Meditrol was lying, and that they had sent all of his injury information to Meditrol in December, 2018.

3

23. Mr. Pepicelli received a call from Chief Mazzie who said, "why are you calling everyone?"

24. Mr. Pepicelli asked the Chief what he was referring to, and the Chief stated that Mr. Pepicelli called Meditrol and his office.

25. Mr. Pepicelli told Chief Mazzie about what he was told when he was in physical therapy and that the doctor's office had told him to call Human Resources and inquire, and that when he called Human Resources, they told him to call Chief Mazzie.

26. Mr. Pepicelli stated that when he called Chief Mazzie's office, he spoke to the secretary who told him to call Meditrol.

27. Chief Mazzie began yelling on the phone call saying, "[y]our claim never should have been granted in the first place! Stop calling people!" and then hung up.

28. Mr. Pepicelli was also informed that Chief Mazzie had approached the President of the Patrolman's Union, Jermaine Bellard, and told him that he was not going to support Mr. Pepicelli receiving coverage because he had circumvented him and went to the Mayor.

29. Mr. Pepicelli attempted to contact the Union Attorney numerous times, but his calls were ignored.

30. The Union Attorney therefore denied representation of Mr. Pepicelli because of Chief Mazzie's statement to Jermaine Bellard.

31. In or around January of 2020, Mr. Pepicelli's bicep started to ache from the top of his shoulder to his elbow, keeping him up at night.

32. He applied through 111F for a reoccurring injury, but was denied by Chief Mazzie who stated that he knew of no injury.

33. Mr. Pepicelli explained that it was not a new injury, but was a reoccurring injury as a result of his previous injuries in 2015 and 2017.

34. Chief Mazzie stated that if Mr. Pepicelli wanted medical attention, he would have to go through his own insurance.

35. Since Mr. Pepicelli could not get insurance coverage from the City, he was not able to get medical assistance for four months.

36. Dr. Alan Curtis, the same surgeon who operated on Mr. Pepicelli in 2015, stated that he did not understand why he was denied coverage and that the injury was a reoccurring injury.

37. By the time Mr. Pepicelli was able to see Dr. Curtis, his bicep tendon had torn off and was not repairable, resulting in permanent damage.

38. Throughout his employment with Everett PD, Neil Burke, who was a sergeant, discriminated against Mr. Pepicelli based on his Italian heritage, calling him insulting names such as "Guinea."

39. On or about August 20, 2019, around the time that Mr. Pepicelli came into conflict with Chief Mazzie, Mr. Pepicelli called Burke for assistance with a problem during an automobile tow.

40. Burke became angry and began yelling at Mr. Pepicelli for no apparent reason.

41. Later that day, Burke was approached by Captain Paul Hamilton ("Hamilton") of the Everett Police to discuss the interaction between Burke and Mr. Pepicelli.

42. During this conversation, Burke attempted to defend his yelling at Mr. Pepicelli by saying that he had laryngitis.

43. Also during this conversation, Burke became angry and said, "you know what, the more I think about this, the more I think I'm gonna kill that fuckin' Guinea", and then, "no, I think I'm really gonna kill that fuckin' Guinea."

44. Hamilton submitted a written memorandum (*Exhibit A*) to Chief Mazzie detailing his interpretation of this incident, and Chief Mazzie then asked Mr. Pepicelli to write a report (*Exhibit B*) about his issues with Burke.

45. In his report, Mr. Pepicelli outlined an extensive list of issues he had with Burke, going back as far as 2004.

46. Chief Mazzie did not take any action following these reports.

47. Shortly after, Mr. Pepicelli ran into the Mayor of the City of Everett on the street and informed him about the incident with Burke and his use of slurs.

48. The Mayor called Chief Mazzie and asked him to take action.

49. After being contacted by the Mayor, Chief Mazzie became angry with Mr. Pepicelli, saying, "why did you go to the Mayor? Now I can't squash this."

50. During roll call shortly thereafter, Chief Mazzie entered the room and asked Mr. Pepicelli to follow him.

51. When Mr. Pepicelli entered the room, he found Burke and Captain O'Malley, the head of Internal Affairs sitting in the Chief's office.

52. Mr. Pepicelli asked Chief Mazzie why he was asked to be there, and the Chief stated that he "wanted to settle this."

53. During this meeting, Burke became angry and got up to leave.

54. Mr. Pepicelli also got up to leave, but Chief Mazzie extended his arms and blocked him from leaving, telling him to sit back down.

6

55. Burke admitted to calling Mr. Pepicelli a "fuckin' Guinea" but denied saying it numerous times to Capital Hamilton.

56. Mr. Pepicelli met with Chief Mazzie after the meeting, and the Chief asked him what he wanted out of this.

57. Mr. Pepicelli responded, "[w]hat would you do to a patrolman who said what Burke said? At least a three day suspension? Sensitivity training? I would like to see you put it in his file."

58. Upon information and belief, Chief Mazzie did nothing after this conversation.

59. In or around February 2021, Mr. Pepicelli's doctors informed Chief Mazzie that Mr. Pepicelli could no longer work due to his disability.

60. Chief Mazzie ordered Mr. Pepicelli to involuntarily retire rather than allow him to retire due to disability, which would not allow for disability payments to Mr. Pepicelli.

61. Mr. Pepicelli asked Chief Mazzie if he was doing this because Mr. Pepicelli had complained to the Mayor about his disability claims and Burke's slurs to which the Chief responded, "[y]ep, you made your bed, now sleep in it."

62. The Retirement Board denied the involuntary application for retirement, and Officer Pepicelli was forced to voluntarily retire on Febuary 28, 2021, as he had no other option and could not continue working pursuant to his injuries.

63. On June 3, 2021, Mr. Pepicelli filed a Complaint with the Massachusetts Commission Against Discrimination ("MCAD") (Docket No. 21BEM00978), claiming that Everett PD discriminated against him based on his disability and ancestry and retaliated against him for complaining about this conduct to an elected official. *Exhibit C.*

64. The Complaint was also dual-filed with the United States Equal Employment Opportunity Commission ("EEOC").

65. The Complaint has lingered before the MCAD and the EEOC since its filing.

66. Mr. Pepicelli has chosen to remove the case from MCAD and file in this Court pursuant to 804 CMR 1.04(12).

## IV.    CAUSES OF ACTION

### COUNT I

(Discrimination based on Disability – M.G.L. ch. 151B § 4(16) v. Everett, Everett PD, Mazzie)

67. Mr. Pepicelli repeats and realleges Paragraphs 1 through 66 as if set forth in full herein.

68. Mr. Pepicelli was an employee as that term is defined in M.G.L. 151B § 1(6).

69. Everett PD is an employer as that term is defined in M.G.L. 151B § 1(5).

70. Mr. Pepicelli suffered and continues to suffer from disabilities as a result of injuries he incurred while working for Everett PD.

71. It was an unlawful employment practice for Everett PD to refuse to acknowledge Mr. Pepicelli's disability claims even after receiving evidence of the severity of his injuries.

72. It was an unlawful employment practice for Everett PD to deny Mr. Pepicelli necessary medical treatment that would have allowed him to continue to work and would have prevented his injuries from getting to the point of no repair.

73. It was an unlawful employment practice for Everett PD to force Mr. Pepicelli to voluntarily retire rather than allow him to retire due to his disability.

74. As a result of Everett PD's actions, Mr. Pepicelli suffered and continues to suffer significant physical and monetary damages.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, and Burke for violation of M.G.L. ch. 151B § 4(16), discrimination based on disability, in a sum to be determined at trial, plus interest, costs, and attorney's fees.

## COUNT II
(Discrimination based on Heritage – M.G.L. ch. 151B § 4(1) v. Everett, Everett PD, Burke, Mazzie)

75. Mr. Pepicelli repeats and realleges Paragraphs 1 through 74 as if set forth in full herein.

76. While an employee of Everett PD, Mr. Pepicelli was consistently insulted with slurs based on his Italian heritage.

77. As stated *infra*, Neil Burke, who was a Sergeant while Mr. Pepicelli was a Patrol Officer, called Mr. Pepicelli a "guinea" on many occasions, even stating that he was "going to kill that fuckin' guinea."

78. Burke's use of slurs was reported in writing to the Chief by Mr. Pepicelli and several other members of the Department but no action was taken.

79. Mr. Pepicelli was subjected to nearly two decades of abuse based on his heritage and even after receiving multiple reports of such abuse, Everett PD and Chief Mazzie took no action.

80. The actions and inaction of Everett, Everett PD, Burke, and Mazzie constituted, engendered, and prolonged a hostile work environment for Mr. Pepicelli.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, and Burke for violation of M.G.L. ch. 151B § 4(1), discrimination based on heritage, in a sum to be determined at trial, plus interest, costs, and attorney's fees.

## COUNT III
(Retaliation – M.G.L. ch. 151B § 4(4) v. Everett, Everett PD, Mazzie)

81. Mr. Pepicelli repeats and realleges Paragraphs 1 through 80 as if set forth in full herein.

9

82. When Everett PD refused to acknowledge Mr. Pepicelli's disability claims, need for medical treatment, and complaints regarding discrimination, he went to the Mayor of the City of Everett for assistance.

83. Mr. Pepicelli followed all Department protocol by first going to the Chief but to no avail.

84. When Mr. Pepicelli asked the Chief if he was forcing him to involuntarily retire instead of retire based on disability because he had gone to the Mayor, the Chief replied, "yep, you made your bed, now sleep in it."

85. It was an unlawful employment practice for Everett PD to discharge or otherwise discriminate against Mr. Pepicelli for opposing practices forbidden under M.G.L. ch. 151B.

86. As a result of the Defendants' discriminatory and retaliatory practices, the Plaintiff was denied his compensation time, his vacation time, and owed time.

87. As a result of Everett PD's retaliation, Mr. Pepicelli has suffered and continues to suffer significant damages.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, and Mazzie for violation of M.G.L. ch. 151B § 4(4), retaliation, in a sum to be determined at trial, plus interest, costs, and attorney's fees.

## COUNT IV
(Violation of Americans with Disabilities Act – 42 U.S.C. § 12101 v. Everett, Everett PD, Mazzie)

88. Mr. Pepicelli repeats and realleges Paragraphs 1 through 87 as if set forth in full herein.

89. Mr. Pepicelli suffered from a disability as defined by 42 U.S.C. § 12102 which he incurred in his duties as an Everett police officer.

90. Everett PD and Chief Mazzie forced Mr. Pepicelli to voluntarily retire and otherwise discriminated against him due to his disability.

10

91. Everett PD and Chief Mazzie unlawfully refused to accept Mr. Pepicelli's disability claims and requests for medical treatment.

92. As a result of these violations, Mr. Pepicelli has suffered and continues to suffer significant damages, including exacerbation of his injuries which could have been prevented if he was granted medical treatment when requested.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, and Mazzie for violation of the Americans with Disabilities Act, in a sum to be determined at trial, plus interest, costs, and attorney's fees.


## COUNT V
(Negligent Supervision v. Everett, Everett PD, Mazzie)

93. Mr. Pepicelli repeats and realleges Paragraphs 1 through 92 as if set forth in full herein.

94. Everett, Chief Mazzie, and Everett PD owed Mr. Pepicelli a duty of care to protect him from the discrimination suffered by him at the hands of Burke and other members of Everett PD.

95. Mr. Pepicelli and other employees of Everett PD submitted written memoranda outlining Burke's discriminatory comments and behavior toward Mr. Pepicelli over the years.

96. Everett, Chief Mazzie, and Everett PD breached their duty when both Chief Mazzie and the Mayor of Everett were informed of the discrimination and no action was taken to protect Mr. Pepicelli from the harms suffered during his employment.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett and Everett PD for negligent supervision in a sum to be determined at trial, plus interest, costs, and attorney's fees.


## COUNT VI
(Negligent Infliction of Emotional Distress v. Everett, Everett PD, Burke, Mazzie)

97. Mr. Pepicelli repeats and realleges Paragraphs 1 through 96 as if set forth in full herein.

11

98. All Defendants were negligent and contributed to a hostile work environment for Mr. Pepicelli and his eventual forced retirement.

99. As a result of the Defendants' malfeasance, Mr. Pepicelli suffered significant emotional distress.

100.    Not only was Mr. Pepicelli forced to endure years of discrimination in the workplace, but he was also denied the medical care he needed and was left to wonder whether his injuries, which have continuously caused him significant physical pain, would ever be properly treated, or, if treated, properly heal.

101. Mr. Pepicelli informed Chief Mazzie and the Mayor of Everett about Burke's discriminatory comments and his feelings about such comments and no action was taken.

102. Mr. Pepicelli also spoke with Chief Mazzie and the Mayor of Everett about his injuries and need for medical care, but he was still denied.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, Mazzie, and Burke for negligent infliction if emotional distress, in a sum to be determined at trial, plus interest, costs, and attorney's fees.

## COUNT VII
### (42 U.S.C. § 1983 Violation v. Everett, Everett PD, Burke, Mazzie)

103. Mr. Pepicelli repeats and realleges Paragraphs 1 through 102 as if set forth in full herein.

104. At all times relevant hereto, Mazzie and Burke were police officers ("Officers") employed by the City of Everett.

105. Throughout the relevant period of time in which the discrimination took place, the Officers were operating "under the color of law."

106. The discrimination and improper conduct all took place and was facilitated by virtue of the Officers' position as police officers.

12

107. Throughout the duration, the Officers acted under the authorization by the Everett city government, abusing their authority as police officers.

108. There exists a clear nexus between the Officers' official duties as police officers and their discriminatory conduct towards Mr. Pepicelli over the duration of his employment.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, Mazzie, and Burke for violation of 42 U.S.C. § 1983, in a sum to be determined at trial, plus interest, costs, and attorney's fees.

<u>COUNT VIII</u>
(Civil Conspiracy v. Everett, Everett PD, Mazzie)

109. Mr. Pepicelli repeats and realleges Paragraphs 1 through 108 as if set forth in full herein.

110. As stated *infra*, Chief Mazzie continually denied disability coverage to Mr. Pepicelli even though he had proof of his injuries while on the job.

111. Mr. Pepicelli asked the Mayor of Everett for help concerning such payments, and no action was taken other than instructing Chief Mazzie to take care of it.

112. Mr. Pepicelli was also denied representation by the Union Attorney because Chief Mazzie spoke to Union President Jermaine Bellard and influenced him to deny such representation.

113. As a result of the conspiracy between the Defendants, Mr. Pepicelli suffered significant damages.

WHEREFORE, the Plaintiff demands judgment and damages against Defendants Everett, Everett PD, and Mazzie for civil conspiracy, in a sum to be determined at trial, plus interest and costs.

THE PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.

Date: September 21, 2023

Respectfully Submitted,

Joseph Pepicelli
Plaintiff
By his Counsel,

Steven J. Marullo, Esq. (BBO # 323040)
Cassidy E. Almon, Esq. (BBO # 710691)
435 Newbury Street, Suite 217
Danvers, MA 01923
Tel: (617) 723-1111
Email:  sjmlaw@verizon.net

14

Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOSEPH PEPICELLI, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:23-CV12406-JEK |
| | ) | |
| EVERETT POLICE DEPARTMENT, | ) | |
| CITY OF EVERETT, | ) | |
| POLICE CHIEF | ) | |
| STEVEN MAZZIE (RET.), and | ) | |
| LIEUTENANT NEIL BURKE, | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT LIEUTENANT NEIL BURKE'S RESPONSES TO
PLAINTIFF'S REQUEST FOR ADMISSIONS**

1. Admit that you became employed by the Everett Police Department as a patrolman in 1993.

   RESPONSE: Admitted.

2. Admit that you were promoted to the rank of Sergeant in 2003.

   RESPONSE: Admitted.

3. Admit that you were promoted to the rank of Lieutenant in approximately 2014.

   RESPONSE: Admitted.

4. Admit that you knew the Plaintiff prior to his employment with the Everett Police Department.

   RESPONSE: Admitted.

5. Admit that you believe that office Pepicelli was employed by the Everett Police Department as a patrolman in approximately 2005.

   RESPONSE: Admitted.

1

6.  Admit that you belonged to a gym in Somerville, Massachusetts prior to working at the
    Everett Police Department.

    RESPONSE: Admitted.

7.  Admit that Officer Pepicelli belong to the Somerville Massachusetts gym at the same
    time as you.

    RESPONSE: Admitted.

8.  Admit that you knew Officer Pepicelli through your common acquaintances at the
    Somerville gym.

    RESPONSE: Admitted.

9.  Admit that, although you knew each other at the gym, you did not socialize with each
    other.

    RESPONSE: Admitted.

10. Admit that Officer Pepicelli never worked on your shift.

    RESPONSE: Admitted.

11. Admit that you never directly supervised Officer Pepicelli.

    RESPONSE: Admitted.

12. Admit that on occasion, Officer Pepicelli's shift would overlap with your shift at the
    Everett Police Department.

    RESPONSE: Admitted.

13. Admit that you recall the circumstances involving the allegation that you used an ethic
    slur regarding Officer Pepicelli.

    RESPONSE: Admitted.

14. Admit that you received a telephone call from Office Pepicelli while you both were working.

RESPONSE: Admitted that I was working as part of a regularly-scheduled shift, and that Officer Pepicelli was working a detail. Denied that I was supervising him.

15. Admit that you claim that you had laryngitis on the day of that telephone call.

RESPONSE: Admitted that I had laryngitis. Admitted that I have stated that I did.

16. Admit that you have produced no documentation demonstrating that you had laryngitis that day.

RESPONSE: Admitted. Denied that I was asked to produce any.

17. Admit that you are aware that laryngitis impedes one's ability to speak in a normal voice.

RESPONSE: Defendant cannot admit or deny this statement, as to his awareness or the symptoms of laryngitis. Defendant is not a doctor or medical professional.

18. Admit that you are aware that laryngitis impeded one's ability to speak in a loud voice.

RESPONSE: Defendant cannot admit or deny this statement, as to his awareness or the symptoms of laryngitis. Defendant is not a doctor or medical professional.

19. Admit that Officer Pepicelli asked for your assistance on that call.

RESPONSE: Admitted.

20. Admit that you stated that you would attempt to assist Officer Pepicelli during that call.

RESPONSE: Admitted that I did try to assist Officer Pepicelli; I cannot admit or deny whether I stated "I would attempt to assist Officer Pepicelli" in those exact words.

21. Admit that you thereafter sent a text message to Officer Pepicelli stating that you were unable to assist both.

RESPONSE: Admitted that I sent a text message to Officer Pepicelli stating I was unable to assist Officer Pepicelli but denied as to the term "both" as I am not aware of multiple requests for assistance by Officer Pepicelli.

22. Admit that you spoke harshly to Officer Pepicelli that day.

RESPONSE: Denied.

23. Admit that a couple of hours thereafter you had an argument with Captain Paul Hamilton.

RESPONSE: Admitted.

24. Admit that you claim that Captain Hamilton happened to be a friend of Office Pepicelli.

RESPONSE: Admitted that it is my belief that Captain Hamilton and Officer Pepicelli are friends. Denied that I have made any "claims" concerning this.

25. Admit that you claim that Captain Hamilton argued with you in the men's bathroom at the Everett Police Station because you yelled at Officer Pepicelli earlier in that day.

RESPONSE: Admitted that Captain Hamilton argued with me. Denied that I yelled at Officer Pepicelli.

26. Admit that you replied to Captain Hamilton that you did not yell at Officer Pepicelli.

RESPONSE: Admitted.

27. Admit that you believed at the time that Captain Hamilton was threatening to fight you.

RESPONSE: Admitted.

28. Admit that you allege that "there was a bunch of people listening to the conversation" with Officer Pepicelli.

RESPONSE: Admitted.

29. Admit that Captain Hamilton stated that he would believe Office Pepicelli over you.

RESPONSE: Admitted.

4

30. Admit that Captain Hamilton based his actions based on your history with Officer Pepicelli.

RESPONSE: Admitted that Captain Hamilton stated something to the effect of "based on your past history you have with him" when Captain Hamilton told me he would believe Officer Pepicelli over me. Denied that this is a reasonable basis for belief.

31. Admit that you called Officer Pepicelli a "fucking guinea" to Captain Hamilton.

RESPONSE: Admitted that I referred to him in that way. Denied that Officer Pepicelli was present to be "called" anything.

32. Admit that you have read Captain Hamiton's Memorandum affirming that you stated "I am going to kill that fucking guinea:" in reference to Officer Pepicelli.

RESPONSE: Admitted that I have read Captain Hamilton's Memorandum making alleging that I stated "I am going to kill that fucking guinea." Denied that the statement cited is true.

33. Admit that as a police officer you are aware that using the words "Fucking guinea" violates the antidiscrimination laws with respect to someone's national origin.

RESPONSE: Objection, this Request calls for a legal conclusion that Lieutenant Neil Burke ("Lt. Burke") is not qualified to give. Notwithstanding the objection, denied.

34. Admit that threatening to kill someone based on their national origins is considered to be a hate crime.

RESPONSE: Objection, this Request calls for a legal conclusion that Lt. Burke is not qualified to give. Notwithstanding the objection, denied.

35. Admit that you referred to Officer Pepicelli as a "kid".

RESPONSE: Admitted.

5

36. Admit that you did not believe that what had happened with Officer Pepicelli earlier that day "wasn't anything out of the ordinary".

RESPONSE: Admitted.

37. Admit that you stated that you think Officer Pepicelli is incompetent.

RESPONSE: Admitted.

38. Admit that you and Officer Pepicelli avoided each other until 2-2 ½ months later.

RESPONSE: Admitted.

39. Admit that the Chief of the Everett Police told you that he had received a call from the Mayor of Everett regarding this incident regarding Officer Pepicelli.

RESPONSE: Admitted.

40. Admit that the word "guinea" is a derogatory slur towards people of Italian heritage.

RESPONSE: Admitted.

41. Admit that the word "guinea" is discriminatory language towards people of Italian heritage.

RESPONSE: Objection, this Request calls for a legal conclusion that Lt. Burke is not qualified to give; furthermore, actions are discriminatory, not "language," and therefore, denied.

42. Admit that you have used the word "guinea" on other occasions other than the present matter.

RESPONSE: Admitted.

43. Admit that the word "guinea" is "not a word that you use that often".

RESPONSE: Admitted.

6

44. Admit that you did not hear from Chief Mazzie until two and a half months later and he wanted to talk about the incident.

RESPONSE: Admitted.

45. Admit that the Chief told you that the Mayor was upset about the incident.

RESPONSE: Admitted.

46. Admit that you portrayed Officer Pepicelli's written statement regarding the incident as outlandish and comical.

RESPONSE: Admitted.

47. Admit that you had to apologize to Officer Pepicelli for calling him a "fucking guinea".

RESPONSE: Admitted.

48. Admit that you said that Chief Mazzie was unhappy with you "for having done this" and "for having to deal with this".

RESPONSE: Admitted.

49. Admit that Chief Mazzie told you to apologize.

RESPONSE: Admitted.

50. Admit that you said that "if you don't carry a gun in the North End, you won't get into a gunfight".

RESPONSE: Admitted.

51. Admit that the Chief did not discipline you for using the slur in reference to Officer Pepicelli.

RESPONSE: Admitted.

52. Admit that you have not received antidiscrimination training either before or after the Pepicelli incident.

7

RESPONSE: Admitted

53. Admit that you thought it weas "ridiculous" for Officer Pepicelli to complain to the Mayor about your statement that you were "going to kill that fucking guinea".

RESPONSE: Admitted that I thought it was ridiculous for Officer Pepicelli to complain to the Mayor but I do not believe I said, nor do I recall saying, I "was going to kill that fucking guinea."

54. Admit that you claim it was ridiculous that Officer Pepicelli went to the Mayor to complain about the incident.

RESPONSE: Admitted.

55. Admit that the Chief took no actions regarding this slur incident until 2 ½ months later when office Pepicelli complained to the Mayor.

RESPONSE: I cannot admit or deny what Chief Mazzie did, and when, as it is outside my personal knowledge.

56. Admit that your statements regarding Officer Pepicelli communication with the Mayor and the circumstances surrounding their communication is mere speculation on your part.

RESPONSE: Denied.

57. Admit that it is your opinion that Officer Pepicelli struggled with routine police officer tasks.

RESPONSE: Admitted.

58. Admit that you and Officer Pepicelli rarely had contact on duty as police officers.

RESPONSE: Admitted.

59. Admit that it is your belief that other police officers had to be responsible to help Officer

Pepicelli out on a daily basis.

RESPONSE: Admitted.

60. Admit that using slurs such as "fucking guinea" are not appropriate in the workforce.

RESPONSE: Objection. It is not clear what "appropriate" means in this context.

Notwithstanding, admitted.

<div style="margin-left: 50%;">

As to objections,
THE DEFENDANT,
LIEUTENANT NEIL BURKE,
By His Attorneys,

_____

Nora R. Adukonis, BBO No. 675932
Stephen J. LaMonica, BBO No. 696276
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA  01940-2682
(781) 309-1500
adukonis@litchfieldcavo.com
lamonica@litchfieldcavo.com

</div>

9

## <u>CERTIFICATE OF SERVICE</u>

I, Nora R. Adukonis, do hereby certify that on this 25th day of February, 2026, I served the within document by electronic mail, to all counsel of record as follows:

Cassidy E. Almon, Esq.
Steven J. Marullo, Esq.
Law Offices of Steven J. Marullo
435 Newbury Street, Suite 217
Danvers, MA 01923
cealmonlaw@gmail.com
sjmlaw@verizon.net
***Counsel for Plaintiff***

_____

Nora R. Adukonis

Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH PEPICELLI,<br>       Plaintiff,<br><br>v.<br><br>EVERETT POLICE DEPARTMENT,<br>CITY OF EVERETT,<br>POLICE CHIEF<br>STEVEN MAZZIE (RET.),  and<br>LIEUTENANT NEIL BURKE,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      C.A. No. 1:23-CV12406-JEK |

**DEFENDANT POLICE CHIEF STEVEN MAZZIE'S RESPONSES TO**
**PLAINTIFF'S REQUEST FOR ADMISSIONS**

1. Admit that you were the Chief of Police for the City of Everett, Massachusetts from

   January 29, 2003 until your retirement.

   RESPONSE: Admitted.

2. Admit that as the Chief of Police, you had the sole authority to supervise and manage the

   police officers employed by the City of Everett.

   RESPONSE: Denied.

3. Admit that among those police officers was Lieutenant Neil Burke.

   RESPONSE: Admitted.

4. Admit that among those police officers was Office Joseph Pepicelli.

   RESPONSE: Admitted.

5. Admit that among those police officers was Captain Paul Hamilton.

   RESPONSE: Admitted.

1

6. Admit that Pepicelli began working for the Everett Police Department on July 24, 2006 as a Patrol Officer.

RESPONSE: Admitted.

7. Admit that you joined the Everett Police Department as a patrol office in 1992.

RESPONSE: Admitted.

8. Admit that you rose through the ranks of the Everett Police Department as Patrol Officer, Sergeant, Lieutenant, and Chief from 1992-2003.

RESPONSE: Admitted that I was a Patrol Officer, Sergeant, and Lieutenant for the Everett Police Department from 1992-2003, which is the year I was promoted to Chief, a role I served in until my retirement.

9. Admit that as Chief of the Everett Police Department you were responsible for the direct oversight of all members of the police department.

RESPONSE: Admitted.

10. Admit that as the Chief of Police, you did not perform formal evaluations of the police officers employed by the Everett Police Department.

RESPONSE: Admitted.

11. Admit that you met Jospeh Pepicelli many years ago when you were in Hugh School while you both lived in the North End of Boston.

RESPONSE: Admitted that I met Joseph Pepicelli when I was in high school.

12. Admit that you interviewed Jospeh Pepicelli for the position of an Everett police Officer in the early 2000's.

RESPONSE: Admitted.

13. Admit that, once you completed your assessment of Jospeh Pepicelli's candidacy for the officer's position, you made a recommendation to the Mayor of the city of Everett to hire Mr. Pepicelli.

RESPONSE: Admitted.

14. Admit that at that time, the Mayor of the City of Everett had the hiring authority for the Police officers for the City.

RESPONSE: Admitted.

15. Admit that, at that time, the Mayor decided who was hired, promoted or fired as such Everett Police Officers.

RESPONSE: Admitted.

16. Admit that as the Chief of police you did not directly supervise Office Pepicelli.

RESPONSE: Admitted.

17. Admit that as the Chief of police you did not see officer Pepicelli "much".

RESPONSE: Admitted.

18. Admit that you cannot remember having any conflicts with Office Pepicelli while he was an Everett Police Office.

RESPONSE: Admitted.

19. Admit that you cannot remember if you were aware of any medical issues or injuries at the time of Mr. Pepicwelli's hiring as an Everett Police Officer.

RESPONSE: Admitted.

20. Admit that Paul Hamilton was hired by the Everett Police Department at approximately the same time as Joseph Pepecelli was hired.

RESPONSE: Admitted.

3

21. Admit that you had a good working relationship with Paul Hamitlon.

RESPONSE: Admitted.

22. Admit that Paul Hamilton was promoted several times while working for the Everett police Department and eventually achieved the ranks of captain.

RESPONSE: Admitted.

23. Admit that The Defendant Neil Burke was hired by the Everett Police Department after you were hired by the Department.

RESPONSE: Admitted.

24. Admit that Neil Burke eventually achieved the rank of Lieutenant with the Everett Police Department.

RESPONSE: Admitted.

25. Admit that you are aware §111F is a statute, pursuant to your understanding, which covers police officers and firefighters who are injured in the line of duty.

RESPONSE: Admitted, in part. This statute provides for leave without loss of pay for officers who are incapacitated for duty as a result of injuries sustained in the line of duty, without fault of their own.

26. Admit that if an Everett Police Officer desires to file a 111F application, such officer would be required to fill out paperwork that the Everett police Department created.

RESPONSE: Admitted that the application is paperwork; I cannot admit or deny who created the documents or forms.

27. Admit that such claim paperwork for an on duty injury would be required to be submitted through the office of the Everett Chief of Police.

RESPONSE: Admitted.

28. Admit that such claim paperwork was initially submitted to you as Chief of Police and that you would either preliminarily approve it or deny it.

RESPONSE: Admitted I would preliminary approve, deny, or send back the 111F request after reviewing the paperwork.

29. Admit that the claim paperwork that was submitted to the Everett City Hall was simultaneously submitted, via copy thereof, to a third-party company that handled such on-duty injury/illness claims for the City of Everett.

RESPONSE: Admitted that claims paperwork was submitted to a third-party administrator. I cannot admit or deny whether it was always "simultaneous."

30. Admit that you, as Police Chief, reviewed medical records of the applicant as part of the claim process.

RESPONSE: Admitted.

31. Admit that you as the Police Chief had training and obtained experience reviewing and processing such §111F claims.

RESPONSE: Admitted.

32.  Admit that you as Chief of Police, processed between approximately 150-200 such § 111F claims.

RESPONSE: Admitted.

33. Adjust that you approved the vast majority of such §111F claims as Police Chief.

RESPONSE: Admitted that I approved the vast majority of 111F claims as long as all of the paperwork was included and there was supporting documentation.

34. Admit that a reason for denial of §111F claim was that if you determined that an incident did not happen which was claimed to have happened such would result in a denial of such claim by you.

RESPONSE: Admitted.

35. Admit that a reason that you would deny a §111F claim was that the claim package was inaccurate or incomplete.

RESPONSE: Admitted.

36. Admit that an approved claimant would be determined to receive treatment and/or rehabilitation.

RESPONSE: Denied. G. L. c. 41 § 111F does not provide for an award of medical expenses; G.L. c. 41, § 100 provides for reimbursement of expenses for medical treatment sustained "as the natural and proximate result of an accident occurring or of undergoing a hazard peculiar to his employment, while acting in the performance and scope of duty without fault of his own."

37. Admit that you recall that Officer Pepicelli had a couple of slip and fall type injuries.

RESPONSE: Admitted.

38. Admit that you do not remember the details of the slip and fall injuries suffered by Officer Pepicelli.

RESPONSE: Admitted that at the time of my deposition, I did not, and presently do not, recall all of the details for all of the alleged slip and fall injuries suffered by Office Pepicelli.

39. Admit that you recall that Officer Pepicelli filed "a lot of §111F ", and that you do not recall the details of those claims.

RESPONSE: Admitted that Officer Pepicelli filed "a lot of §111F ", and that I do not recall the all of the details of those claims.

40. Admit that you recall Officer Pepicelli slipping on snow on some steps while on-duty responding to a call in 2015.

RESPONSE: Admitted that I recall this being reported; denied that I have personal knowledge of the incident.

41. Admit that you recall Officer Pepicelli slipping on ice in the back of the police Station parking lot in 2017 at the end of his shift.

RESPONSE: Admitted that I recall this being reported; denied that I have personal knowledge of the incident.

42. Admit that the slip and fall suffered by Officer Pepicelli in the Police Station parking lot was captured by a surveillance camera located behind the Everett Police Station.

RESPONSE: Admitted that I recall this being reported; denied that I have personal knowledge of the incident.

43. Admit that you denied Officer Pepicelli's §111F claim for the injuries he suffered as a result of his slip and fall on ice in the Police Department parking lot.

RESPONSE: Admitted that I did not immediately accept the claim, as Officer Pepicelli provided no evidence that he was "incapacitated" and required leave upon reporting the claim in August of 2017, as he had worked subsequent to the injury. Denied that the claim was "denied," as Officer Pepicelli did take medical leave without loss of pay pursuant to G.L. c. 41 § 111F from August 11, 2017 to September 27, 2018.

44. Admit that you claim that Mr. Pepicelli did not submit his §111F claim until 4-6 months after the slip and fall incident.

RESPONSE: Admitted.

45. Admit that you did not review the video of officer Pepicelli's slip and fall incident until after your denial of Office Pepicelli's §111F claim.

RESPONSE: Admitted.

46. Admit that all relevant times as Chief of Police for the City of Everett that you had full access to said video.

RESPONSE: Admitted.

47. Admit that there is no rule or regulation as to the timing of a §111F claim submission.

RESPONSE: Denied.

48. Admit that you acknowledge that some injuries do not manifest symptoms until a while after such incident.

RESPONSE: Admitted that some injuries do not manifest symptoms immediately, to the best of my knowledge; however, denied that "manifestation" of "symptoms" is what is required for benefits under  G. L. c. 41 § 111F, which provides leave without loss of pay while an officer is incapacitated from work.

49. Admit that under your term as Chief of Police, Cook & Company was the insurance provider for the Everett Police Department.

RESPONSE: Denied. Cook & Company is a claims administrator.

50. Admit that such insurance coverage was transitioned from Cook & Company while you were Chief of Police.

RESPONSE: Denied. Cook & Company is a claims administrator.

8

51. Admit that Officer Pepicelli contacted you regarding his §111F claim since the new insurance company stated that they had no record of officer Pepicelli's §111F claim on file.

RESPONSE: Denied that there was a "new insurance company." Admitted that Officer Pepicelli contacted me concerning medical treatment. Medical treatment is not a benefit afforded by G. L. c. 41 § 111F.

52. Admit that you provided no assistance to Officer Pepicelli regarding the discontinuation of his §111F claim benefits by the new insurance company.

RESPONSE: Denied, and denied further that Officer Pepicelli had §111F claim benefits "discontinued" by the new insurance company, as §111F provides for leave without loss of pay while an officer is incapacitated from work. Medical treatment is governed by G.L. c. 41 § 100.

53. Admit that Officer Pepicelli complained to the Mayor's Office of the City of Everett about his injuries and your recalcitrance to assist him with Cook & Company.

RESPONSE: Denied.

54. Admit that you were angry that Officer Pepicelli went directly to the Mayor of the City of Everett due to your recalcitrance with respect to Pepicelli's §111F claim.

RESPONSE: Denied.

55. Admit that a reinjury of a provision's injury, i.e., a "flare up" of a previous injury, can be treated as a new injury for the purpose of the application of 111F.

RESPONSE: Responding party cannot admit or deny this request, because it is based on a fundamental misstatement and misapplication of law. G. L. c. 41 § 111F affords leave without loss of pay when an officer becomes incapacitated due to injury in the line of

9

duty, and the right to benefits under that section terminates when the officer is no longer incapacitated. *See Hennessey v. Town of Bridgewater*, 388 Mass. 219, 226 (1983).

56. Admit that you claim that Office Pepicelli filed "a lot of 111F's".

RESPONSE: Admitted.

57. Admit that some injuries can take a while to start exhibiting symptoms.

RESPONSE: Admitted.

58. Admit that you do not recall telling Jermaine Bellard president of the Everett Patrolmen's Union that you would not support Office Pepicelli's claim because he went directly to the Mayor's regarding his claim.

RESPONSE: Admitted that I do not recall any such conversation occurring.

59. Admit that Neil Burke was a Sergeant with the Everett police Department at the time that Sergeant Burke used a slur with reference to Officer Pepicelli's national heritage.

RESPONSE: Admitted.

60. Admit that it is your memory that the slur was not spoken directly to Officer Pepicelli.

RESPONSE: Admitted.

61. Admit that it is your recollection that the slur was stated to Captain Paul Hamilton by Sergeant Neil Burke.

RESPONSE: Admitted.

62. Admit that you were informed that Sergeant Burke referred to Officer Pepicelli as a " fucking guinea" as the slur.

RESPONSE: Admitted.

10

63. Admit that the use of that slur in the context used by Sergeant Neil Burke is highly offensive.

RESPONSE: Denied that the use is "highly offensive" in an objective sense; admitted that some people would find the term offensive.

64. Admit that you were told that Sergeant Burke stated that he would " kill that fucking guinea" in reference to Officer Pepicelli.

RESPONSE: Admitted that someone alleged Sergeant Burke said that he would "kill that fucking guinea" in reference to Officer Pepicelli. Denied that it occurred.

65. Admit that Sergeant Burke was a superior to Office Pepicelli in rank at all relevant times.

RESPONSE: Defendant cannot admit or deny, based on the lack of definition of "all relevant times," admitted that "sergeants" generally "outrank" patrolmen; however, not all sergeants supervise all patrolmen.

66. Admit that you knew there was tension between Sergeant Burke and Office Pepicelli in the workplace.

RESPONSE: Denied.

67. Admit that you did not conduct a formal investigation into the Burke/ Pepicelli slur incident and that you had a meeting with Sergeant Burke and Officer Pepicelli because Officer Pepicelli complained to the Mayor.

RESPONSE: Defendant cannot admit or deny, as this is a compound request. Admitted that Mayor DeMaria notified me of the incident, and a meeting occurred as a result. There was subsequently an investigation. Denied that there was no investigation.

68. Admit that you did not open a file for your records pertaining to the Burke/ Pepicelli slur incident.

11

RESPONSE: Defendant cannot admit or deny, given the undefined nature of the term "open a file." Statements were taken concerning the incident that was related by Officer Pepicelli to Mayor DeMaria. These statements were gathered and saved electronically.

69. Admit that Captain Paul Hamilton provided an Affidavit under oath swearing to the truth of the incident.

RESPONSE: Admitted that Captain Paul Hamilton provided a statement, under the pains and penalties of perjury.

70. Admit that, as the Chief of Police you took no action, formally or informally in writing or verbally, against Sergeant Burke for his threat to kill Officer Pepicelli.

RESPONSE: Denied that I took no action concerning the incident described; denied that the incident described was a "threat to kill" Officer Pepicelli.

71. Admit that as Chief of Police you took no action against Sergeant Burke for referring to Officer Pepicelli as a "fucking guinea".

RESPONSE: Denied.

72. Admit that Captain Paul Hamilton took the proper corrective action in admonishing Sergeant Neil Burke for stating that he would "Kill that fucking guinea" in referring to Officer Pepicelli.

RESPONSE: Denied. The Everett Police Department has a formal procedure to follow; Captain Hamilton was not authorized to escalate the situation or confront Sergeant Burke without taking further steps.

73. Admit that you chastised Captain Hamilton for coming to the defense of his junior Officer Joseph Pepicelli, telling Captain Hamilton not to "throw his weight around".

12

RESPONSE: Denied that Captain Hamilton was "chastised," admitted that Captain Hamilton did not follow proper procedure.

74. Admit that Sergeant Burke admitted to you that he used the slur in reference to Officer Pepicelli.

RESPONSE: Admitted.

75. Admit that Sergeant Burke apologized to Officer Pepicelli in your presence.

RESPONSE: Admitted.

76. Admit that no disciplinary action was taken against Sergeant Burke.

RESPONSE: Admitted.

77. Admit that Office Pepicelli complained to the Everett Mayor's Office regarding this incident.

RESPONSE: Admitted.

78. Admit that other a verbal telephone conversation with one of the Mayor's Office staffers, you provided no written report to the Mayor regarding the use of the phrase by Sergeant Burke that he would "Kill that fucking guinea."

RESPONSE: Admitted that I provided no "written report" over the telephone. Denied that a written report was required.

79. Admit that you do not recall while you were Chief whether the Everett Police Department provided antidiscrimination training for its officers.

RESPONSE: Admitted.

80. Admit that you do not recall whether any other slur occurred with the Everett Police Department during your tenue as Chief.

RESPONSE: Admitted.

13

81. Admit that you described Officer Pepicelli as a "good police officer".

    RESPONSE: Admitted.

82. Admit that you were familiar with the process with which a police officer can retire based

    on disability.

    RESPONSE: Admitted.

83. Admit that your role in the disability retirement process was providing any

    documentation you had to support an officer's claim for a specific disability.

    RESPONSE: Admitted.

84. Admit that you do not recall whether or not you were required to make a

    recommendation as to Officer Pepicelli's request for a disability retirement.

    RESPONSE: Admitted.

85. Admit that you do not remember that Officer Pepicelli's injuries began recurring in or

    around January 2020.

    RESPONSE: Admitted that I have no memory; I cannot admit or deny whether the

    injuries in fact began "recurring."

86. Admit that you stated to Officer Pepicelli that if he wanted treatment for his injuries he

    should use his own insurance.

    RESPONSE: Admitted that I testified that I "probably" stated this to Officer Pepicelli;

    admitted that G.L. c. 41 § 100 explicitly provides for "reimbursement" of medical

    expenses.

87. Admit that you required Officer Pepicelli to seek treatment at his own cost and thereafter to seek reimbursement.

RESPONSE: Denied.

88. Admit that you received a letter from Officer Pepicelli's doctor thereafter stating that Officer Pepicelli was unable to work anymore due to his injuries.

RESPONSE: Admitted I received a letter from Officer Pepicelli's doctor that indicated Officer Pepicelli was unable to or could not work anymore but I do not recall more specific details, including whether or not the reason was due to Officer Pepicelli's alleged injuries.

89. Admit that Officer Pepicelli was required to use his personal time to attend to his injuries.

RESPONSE: Denied.

90. Admit that you put in Officer Pepicelli's retirement papers prior to seeking his consent.

RESPONSE: Denied.

91. Admit that you are not certain whether Officer Pepicelli retired from the Everett Police Department voluntarily.

RESPONSE: Denied.

92. Admit that you do not recall if you made any recommendations to the Retirement Board as to whether he could retire on disability or not.

RESPONSE: Admitted.

93. Admit that you had no reason to doubt Officer Pepicelli's permanent injuries that he was alleging.

RESPONSE: Denied.

15

94. Admit that you do not remember stating to Officer Pepicelli "you made your bed, now sleep in it".

RESPONSE: Admitted that I do not remember ever saying so. Denied that it occurred.

95. Admit that you spoke to Sergeant Burke prior to the depositions in the present litigation.

RESPONSE: Admitted I informed Sergeant Burke about the depositions.

96. Admit that you believe that Officer Pepicelli's retirement from the Everett police Department was voluntary.

RESPONSE: Admitted.

97. Admit that you were angry that Officer Pepicelli complained to the Mayor of Everett regarding your handling of his injury claims.

RESPONSE: Denied.

As to objections,
THE DEFENDANT,
POLICE CHIEF STEVEN MAZZIE,
By His Attorneys,

_____
Nora R. Adukonis, BBO No. 675932
Stephen J. LaMonica, BBO No. 696276
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA  01940-2682
(781) 309-1500
adukonis@litchfieldcavo.com
lamonica@litchfieldcavo.com

16

## **CERTIFICATE OF SERVICE**

I, Nora R. Adukonis, do hereby certify that on this 25th day of February, 2026, I served the within document by electronic mail, to all counsel of record as follows:

Cassidy E. Almon, Esq.
Steven J. Marullo, Esq.
Law Offices of Steven J. Marullo
435 Newbury Street, Suite 217
Danvers, MA 01923
cealmonlaw@gmail.com
sjmlaw@verizon.net
***Counsel for Plaintiff***

_____
Nora R. Adukonis

Exhibit 4

## Chief Steven Mazzie

| | |
|---|---|
| From: | Mayor Carlo DeMaria |
| Sent: | Monday, November 04, 2019 9:52 AM |
| To: | Chief Steven Mazzie; Kevin O'Donnell |
| Subject: | Neil Burke / Joe Peppecelli |

Would like them both to come in with their union reps if they want and Paul Hamilton ( if available ) regarding the use of the word Guinea .
Thank you

Sent from my iPhone

Meeting was held w/ Pepp, Burke + O'Malley. After review + hearing everything they were counseled w/ no further action. Burke apologized to Pepp.

1

# Exhibit 5

To:  Chief Steven Mazzie

From: Officer Joseph Pepicelli

Re: Lt Burke

---

Sir; I respectfully submit

As you requested, incidences that occurred between Lt Burke and myself. Please note that the incidences occurred over a number of years and may not be in chronological order.

I first met Lt Burke somewhere between 2004 and 2005. We met at world gym and became acquaintances. We spoke almost every time we were at the gym.  I noticed that he was always overly opinionated and at some times, condescending.

One day when I entered the gym, Neil Burke was on the right side of a cable fly machine and turned to me and stated, " how are you doing?" I replied, "Fine thank you. Neil turned to me again and said, "How are your brothers doing? I said fine thank you. Then Neil then turned to me and stated, " Fucken guinea's! Guinea's with a gun! Fucken guinea's!" They should have never been carrying guns! Fucken guinea's!" At this time I couldn't believe my ears. I said what are you talking about? My brothers had firearms permits and they never even had a parking ticket on their names! So what are you talking about? I then pointed at Neil and said, "I don't know what your problem is but I'm going to walk away from you! At this point I walked away from him and when I was about 20 yards away from him, he ran across the gym and called my name. I turned and looked at him and he stated, "Joe! Maybe I was out of line. I stated, "You think? You think it's too late?" I walked away from Neil and we didn't speak for about one year. At this time I was given the job as Everett police.

When I started the job at Everett Police Dept.,  I tried to remain as professional as possible and at one point Sgt Neil burke was my supervisor.  I respected the fact that he was a Sergeant and referred to him as Sergeant and never called him by his first name out of respect for his rank. For the next number of years I had to endure his condescending, overly opinionated ways that at some times was unbearable. But I remained respectful.

One day, myself, Lt Gabriel and Sgt Durant were at Dunkin Doughnuts North having coffee when Lt Gabriel asked how my wife was doing. I stated that she was doing great and started doing cardio instead to drop some muscle. All of a sudden I heard Sgt Burke enter a door behind me, approached the table and said, "She'll never drop the muscle at the top of her ass! I turned to him and said, "Why are talking about my wife? He stated "She doesn't even like me, she never even acknowledges me at the

gym! I then stated, "So where is this going?" He then started to yell some rant and "yelled, It's over!" I then just walked away.

At one time I purchased a sniper decal from Sniper Central for $15 and put it in the rear of my Toyota Tacoma. When I approached my vehicle at one point, I noticed that someone attempted to pick at the sniper decal off of my rear window and damaged it. I was very upset and wondered why someone would do such a thing. A short time later Paul Hamilton approached me and stated that he was just in the station when Neil Burke approached him and said, "What is that sticker in the back of Joe Pep's truck? Is that a guinea thing?" At this time I felt that it safe to assume that the sticker on my truck window had been damaged by Neil Burke. Again, I had to tuck tail because my family needed me and I didn't want to jeopardize my job.


Another incident that occurred on Main St was when an elderly man, driving southbound, got into an m/v accident. When I arrived I observed the older black male was pacing around his vehicle and Everett Fire Dept. arrived on scene facing north bound on Main St. I approached the elderly man to enquire if he were injured. After I found that he was ok I asked him to move my vehicle to the curb to alleviate the traffic on Main ST. I entered back into my cruiser and looked up to see that the elderly man was walking around his vehicle to observe the damage that was done. Again I exited my cruiser and instructed the elderly man to move his vehicle to the side. When I entered back into my cruiser, my cell phone rang and it was a fellow police officer that I had worked with on Municipal Police. He asked if I could help him with a situation that occurred between he and his ex-girlfriend and that he needed a positive address to send paperwork to in Everett. I immediately asked him if I could call him back because of the car accident. As I was getting off of the call, I looked up to see Neil Burke pounding on my cruiser window and yelling, "Get off that fucking phone! Get off that fucking phone! Why is this car in the middle of the street? I'm going to write you the fuck up! Neil then pointed at three Everett Firefighters that were in earshot to the conversation and stated "And these fucking assholes don't help the situation either! The firefighters seemed slack jawed. Why was this vehicle not moved, as he pointed to the older mans car. I attempted to explain that I asked the older male numerous times and was going to exit my vehicle to ask him to move again. Neil Burke then pointed at my face and said "I want to see you up the street right now!"

I then proceeded up Main St to where Neil Burke was doing a detail. At this point I was both embarrassed and infuriated. I stated to Neil, "With all due respect, if it had been an family emergency, I wouldn't have got off of the phone." When I approached Neil Burke he hovered over me as usual and said, "Do you want to go to the Chief? I replied yes! He asked again, "Do you want to go to the Chief?" Again I said yes! He replied "Because I'll take you to the chief right now!" Again I stated ok I want to go to the Chief. The conversation ended and he dismissed me.
I tried to avoid Neil Burke whenever possible, picking opposite sides and avoiding some details that he would be supervisor. At this time I had not extensively spoken

to Neil Burke only in a professional manner and as very little as possible. At this point I had not worked for or really encountered Neil for about three to four years. I then find out of nowhere I find out that he went to Capt. Basteri to inform him that I should be fired. Capt. Basteri asked Neil as to what reason that I should be fired? To my understanding he stated that Joe doesn't know what he is doing and that someone was going to be hurt because of me. (Which I have proven many times in my career that that was not true.). Again to my understanding Capt. Basteri asked Neil if he had gone to the Chief about his beliefs. And if he would like to go to the Chief now? The conversation was dropped and I still wonder what I did to deserve this kind of treatment.

Not too long ago, my wife and I went to a wake on Main St for an Everett Officer that had lost his mother. My wife and I observed Neil Burke on our way out. I turned to my wife and said "lets go say hello to Neil! My big mistake! He acknowledged me and ignored my wife. This is not professionalism...

And lastly, the most recent incident that occurred when working a detail for R J Devereaux on Carter ST at Main St. While I was working the detail on Carter st, the person driving the street sweeper for the City of Everett stated that Quealy was towing the vehicles of the Devereaux workers that were parked next to 66 Main St. He informed Quealy that they were working for the city and not to tow them. Note that the vehicles that belonged clearly had cones around the vehicles that were parked on Main St and were working back and forth from Carter St to Main St. I then proceeded to the area of 66 Main St to see if I could stop Quealy from towing. By the time I arrived at the area of 66 Main St it was too late and the vehicles had already been towed. Construction workers that were working across the street from where the towed cars were parked stated that they even asked the driver of the Quealy towing NOT TO tow the vehicle and that the owners of the vehicles were on Carter St and were working for the City of Everett. They explained that the driver of the Quealy tow truck said he did not give a fuck and towed them anyway.

At this point I looked for direction from Lt Burke as my supervisor. I then phoned Lt Burke and informed him of my situation. Lt Burke seemed upset and asked as to whom the PaPa units were that tagged the vehicles. I explained to Lt Burke that I was on Carter Street at the time and that I didn't know whom the PaPa unit was.

Lt Burke started to yell at me stating "I'm done! I'm done! I'm loosing my voice! Who was the PaPa unit?" Again I stated I don't know! I was not there. The conversation ended and I went back to Carter St to join my crew. Later I received a text from Lt Burke that stated.

"Joe, queleys wont release the they say they were on hawthorn parked with tickets so they towed them. I called chad luongo at the city because it is a city fuckin problem not ours anyway and they are doing work for the city but he didn't answer. So if you want to go to city hall you can and probably should. But I will not I have lost my voice completely, and am done. . So...take this whatever you wish"

A short time later. I phoned Capt. Hamilton, which we talk about once a day. I stated to him. "I think Neil Burke is mad at me." And I explained the situation to Capt. Hamilton. Capt. Hamilton stated that he would talk to Neil later to see what was wrong and why he was upset at me. I then asked Paul Hamilton not to say anything to Neil Burke because I know how he is and I know that he will find some way to come after me.

Chief, these are only some incidences that occurred but are the incidences that bothered me the most. I've shaken hands with Neil Burke and gave an honest effort quell the past and try, against my better judgment, to let things go. But to no avail. I am positive there is no way that this attack on me by Lt burke will stop. At this point I am not sure what to do.

Respectfully submitted
Officer Pepicelli

To: Chief Mazzie
From Captain Paul Hamilton
Subject: Conduct unbecoming
Date: 10/22/2019

Sir,

On 08/20/19 at about 10:15 am, I received a phone call from Officer Pepicelli. Officer Pepicelli and I engaged in small talk before we got to the meat of the matter.
According to Officer Pepicelli, he had an incident relative to a tow, and was not absolutely certain on how to handle it so he placed a call to Lt Burke for guidance.
According to Officer Pepicelli, Lt Burke became irate with him and began to yell at him, seemingly over nothing. According to Officer Pepicelli, this did not surprise him because he said that he routinely gets treated poorly from Lt Buke, in the past as well as the present.
The call concluded with Officer Pepicelli strongly requesting that I do not bring it to the attention of Lt Burke because he was afraid of reprisals.
I informed Officer Pepicelli that I will speak with Lt Burke but I'll present it in a way so as to not infuriate him. Over the objections of Officer Pepicelli, I thought it best that I present it Lt Burke in an effort to deescalate whatever tensions exist between the two of them and to address the issue.
At some point after that I went into the bathroom and saw Lt Burke there, I asked when he was free if he could speak with me. Lt Burke Pressed me and we began to speak about the incident while we were exiting the bathroom. I asked if he got a call from Officer Pepicelli and what happened. He immediately asked if Joe had called to complain about something. I replied, well, yes, he doesn't understand why you would yell at him over a simple incident like a tow. Lt Burke stated that he was yelling because he had laryngitis, and was losing his voice. I did not detect laryngitis and thought that odd, my thoughts were; could you even yell if you had laryngitis?
I began to explain to Lt Burke that as a supervisor, it is his role to assist officers that need guidance and that they shouldn't be subjected to a boss that yells at them when someone is looking for help.
At about this time, Lt Burke stated to me, "you know what, the more I think about this, the more I think that I'm gonna kill that fucken guinea". I immediately told Lt Burke to calm down and watch what he says before he gets himself into the jackpot, (meaning that he would get into trouble). Again, Lt Burke repeated, "No, I think I'm really going to kill that fucken Guinea". At this point I said to him, " this is the last time I'm going to tell you, watch your mouth". Lt Burke replied, "I don't give a fuck! I replied, " you don't give a fuck now but you will when you're standing before the man", (referring to the Chief).
I then went into my office and was followed by Lt Burke, I tried to calm him down but he was visibly upset and angry. I reiterated my earlier sentiment about being there for his people and not penalizing them for asking him for guidance and help.
Shortly after this, Lt Burke left my office.

Respectfully,

PA-53



# CITY OF EVERETT
# EVERETT POLICE DEPARTMENT
# OFFICE OF THE CHIEF OF POLICE
# 45 ELM STREET
# EVERETT, MASSACHUSETTS 02149

Steven A. Mazzie
Chief of Police

Tel:  617-389-2120
Fax: 617-394-2379

To:  Chief Steven Mazzie

From:   Lt Neil Burke

Subject:  Detail Incident

Date:  Thursday, November 7, 2019

---

On or about Aug 21, 2019 I was working my regular duty shift as shift OIC. At some point during the morning I was asked by Lisa Lamonica to come into central records to deal with an irate citizen at the window who was unhappy with the way an accident report was written up claiming that the officer was racially biased in his report. At this time I received a phone call from Ofc Pepicelli on my personal cell phone. This was either the third or fourth time during that week that Ofc Pepicelli was calling a supervisor to assist him on a detail so I excused myself to the patron at the window explaining that this was also a police matter and answered the call. Ofc Pepicelli proceeded to tell me that he was working a detail on Carter St with RJ Devereaux and that 2 of their vehicles were towed from Main St and that they were at Quealeys Towing and that they would not release the vehicles unless they received a call from Headquarters . I tried to ask Ofc Pepicelli questions as to where they were parked and why they were towed but he was having difficulty answering my questions. That week I had a Chest cold and my throat was raw to the point where it was difficult and painful to talk so, I stopped asking Ofc Pepicelli questions and told him that my voice was gone but that I would make the call to Quealeys. This conversation took place in front of three other people, Ofc Jillian Donnelly, Lisa Lamonica and Gail Russo.

After dealing with the Party at the window I went back to the control room and called dispatch to try to find out who towed the two cars and why. I was told that parking enforcement had not been in the area for well over an hour and that they were now towing in the lower Broadway area. At this point my throat was really bothering me so I asked Ofc Paul Young to call Quealys for me. Ofc Young called Quealys and inquired about the cars. Quealys said the cars were parked on Hawthorne St and had tickets from parking enforcement on them so they were towed. Ofc Young stated that whoever he spoke with seemed a little agitated by the call and said that they did everything right and that they were not going to release the cars. I then called Chad Luongo the parking clerk to ask if there was anything that he could do to help with this situation but my call was not answered. I then sent a text to Ofc Pepicelli detailing to him who I called and relaying the message that Quealys was not going to release

*"Serving With Pride Since 1870"*

the cars so the Devereaux people were on their own to retrieve their vehicles.  A short time later Ofc Frank Nuzzo called me and told me that he was on his break while Ofc Pepicelli was having a melt down about these cars being towed. He said that he would handle it and he did. He later told me that he drove the Devreaux crew down to Quealys to pick up their cars. He then went to City Hall and spoke to Chad Luongo who voided the parking tickets and waived the City portion of the tow fee.  I later learned from Sgt Joe Gaff that Ofc Pepicelli had called him three times on his personal phone until he picked up the phone and asked what the emergency was. It was explained to Sgt Gaff that he already called myself and Capt Hamilton about the cars being towed. Sgt Gaff explained to Ofc Pepicelli that if he already spoke to a Lt and a Capt about the matter he shouldn't be calling a Sgt, especially one who is on vacation in Newport RI.

 For the next couple of hours I booked prisoners and continued on with my duties as shift OIC until I had an occasion to use the mens bathroom located on the first floor. While I was standing using the urinal Capt Hamilton came into the bathroom and started washing his hands.  He looked at me and said "I heard you yelled at Joe Pep today."  I was very surprised at the statement and replied "I didn't yell at him I have laryngitis and can hardly talk and I told him that when I spoke to him."  Capt Hamilton continued with "He said you would say that." "He is not an easy mark you know, I have his back and you can't talk to him like that anymore..or?" I then replied "You're serious?? ..Or?"  Capt Hamilton then stared at me tilted his head to the side shrugged his shoulders and said "Or?" I  then finished at the urinal and washed my hands. We both exited the bath room and entered the hallway.

 My interpretation of what had just happened in the bathroom was that I was threatened by Capt Hamilton. Whether physically or professionally I was still unsure, but  without question,  he was trying to intimidate me.  At this point I still wanted to clarify my position that this incident did not occur the way it was told to him by Ofc Pepicelli. I explained to Capt Hamilton that three other people were present during my conversation with Ofc Pepicelli and that they could corroborate the nature and tone of the entire conversation. I then explained what steps I had taken to help Ofc Pepicelli with his dilemma and that they also could easily be corroborated by other witnesses.

 We both continued walking into the central records room where  Gail Russo was sitting at her desk working. I thought the argument had ended and I was about to leave  when Capt Hamilton pointed his finger at me and stated "I don't believe you, and if anything ever happens in the future I will believe him over  you" I was now irate at this point and my intensity now matched Capt Hamiltons. I asked him "What are you talking about?? Despite the circumstances or the truth?" Capt Hamilton then stated "Because of your track record!"  to which I responded "I have a track record of headhunting guys down here? are you crazy??" Capt Hamilton yelled "Because you have a past history with him" to which I responded "What history are you talking about? That I yelled at him for not doing his job 12 years ago at traffic accident on Main St.?"

 By this time we were both yelling in the middle of central records. Capt Hamilton had threatened me physically and was now questioning my integrity. I then said to Capt Hamillton "Because of that little Guinea asshole liar!" to which he pointed his finger in my face and said "Careful...you can't use that

word around here" to which I replied "What? Guinea? That little Guinea asshole lied about me!!" "I feel fine going up to the Chief, the Mayor or before a Judge regarding my actions today! How about you?"

At this time Capt Hamilton turned and walked into his office and sat down. He then said "I love that kid like a brother , he is not an easy mark, I have his back." I then said "I don't treat him like an easy mark. I do not play tricks on him or make fun of him like the rest of the people around here. I have specific thoughts regarding his competency as a police officer but I didn't hire him. He is here and one of us, and I would help him or anybody else here. I say hello Joe, goodbye Joe and if he brought in a tray of food I would eat it and say thank you Joe. That is how I treat him." I then turned and went back to the control room.

The next day I went to Gail Russo to apologize for losing my temper and raising my voice in her presence. I regret using a derogatory term in speaking about Ofc Pepicelli . In my defense, I was in the middle of an adrenaline rush, angry and speaking about a person who I believed was responsible for me about to be in a physical confrontation . This type of behavior from Capt Hamilton is not unusual for him. I am not the only person in the Superior Officers Union to be threatened by Capt Hamilton, nor am I the only person in the Superior Officers Union who has been  threatened by Capt Hamilton over a perceived slight to Ofc Pepicelli. During this incident I was resolved that he was not going to bully, threaten or intimidate me as he had other people in the past. Until that day I did not have an antagonistic relationship with Capt Hamilton. I have never been on a shift or worked with him since his arrival from The Boston Municipal Police Dept. Had Ofc Pepicelli come to speak to me regarding his hurt feelings about the tenor and tone of our phone conversation, I would have explained to him again that I was not mad at him and he would have realized that I was dealing with laryngitis. If Capt Hamilton said that Ofc Pepicelli  thinks that you are angry with him and asked me to speak with him regarding his hurt feelings I would have, but neither of those things happened.  I have not seen or spoken to either Ofc Pepicelli or Capt Hamilton since this incident occurred over 2 and a half months ago in August.

As for my "track record" "past history" with Ofc Pepicelli , it is neither extensive or remarkable. We do not work on the same shift often and have only been on the same shift once I believe in the 13 years since he also was hired here from the Boston Municipal Police Dept. The accident I referred to verbally with Capt Hamilton happened close to 10 years ago.  I reprimanded Ofc Pepicelli for being on the phone instead of performing his duties at a traffic accident. The next day he told me that  he was upset with me  because I had  embarrassed him by interrupting his phone conversation. That was a typical response for Ofc Pepicelli  who is unable to absorb any type of criticism or professional direction. Dealing with Ofc Pepicelli  is very frustrating as he will either shut down or start to babble incoherently  when he is frustrated , the way a young child would. I have observed Ofc Pepicelli struggle with the everyday responsibilities of being a Police Officer here in Everett, dealing with motor vehicle accidents, writing reports, handling calls for service, etcetera. In many cases either another Officer or Supervisor has to assist him so that he may complete his assignments.

*"Serving With Pride Since 1870"*

I expect all sworn officers to be able to perform the duties required of them and I hold them accountable as such. Ofc Pepicelli knows what I expect from the Patrolman I work with and that I will not coddle him. For this reason I believe that Ofc Pepicelli picks away from me whenever possible. This explains why we have had so little contact since he has been here. I understand that this is something he speaks about often. Last week another patrolman told me that he and others were joking with him about his relationship me a couple of weeks ago. I do not participate in the ridicule of Ofc Pepicelli and cannot fathom his charges of harassment against me.

I have never addressed Ofc Pepicelli by anything other than his given name of "Joe". I have never while on duty or off sought him out to harass him in any way. I have never participated in a prank, joke or had sport at his expense. I have never been accused by any other member of the Everett Police Department of such an offense. I have never been accused by any member of the public in over 26 years of service with the Police Department or close to 30 years as a City of Everett employee of such an offense. I apologize for the use of a derogatory remark albeit under conditions of extreme duress. I vigorously deny any allegations of harassment against Ofc Pepicelli or anyone else.


Respectfully Submitted,

Lieutenant Neil Burke

*"Serving With Pride Since 1870"*

PA-57



# CITY OF EVERETT
# EVERETT POLICE DEPARTMENT
# OFFICE OF THE CHIEF OF POLICE
# 45 ELM STREET
# EVERETT, MASSACHUSETTS 02149

Steven A. Mazzie
Chief of Police

Tel:  617-389-2120
Fax: 617-394-2379

To:         Chief Steven Mazzie

From:       Lieutenant Demetri N. O'Malley

Subject:    Central Records Interviews

Date:       November 18, 20119

On Monday November 18, 2019 I interviewed Officer Jillian Donnelly, Lisa LaMonica and Gail Russo in regards to the incident that occurred with Lieutenant Burke in central records.

Officer Jillian Donnelly states that she was working in central records when an irate male came to the station complaining about the way a crash report was written. This male had been in at least two other times that day. Officer Donnelly stated she tried to handle the individual's complaint but he became more irate as the interaction continued. At some point Lt. Burke was summonsed to central records to speak with the male.  According to Officer Donnelly Lt. Burke spoke with the male calmly and professionally. While Lt. Burke was speaking with the male she states he received a call on his cell phone. Officer Donnelly states she did not know who Lt. Burke was speaking to at the time. Officer Donnelly states that Lt. Burke was calm during this call and he did not yell or seem upset in anyway. She also states that Lt. Burke was talking about a tow and that he kept having to repeat himself several times to the caller who didn't seem to understand Lt. Burkes instructions. When I asked Officer Donnelly if she was able to understand Lt. Burke's instructions she responded "yes".  When asked how the call ended she stated that Lt. Burke told the caller he would call him back or call him back.

Lisa LaMonica stated she was working in central records when this incident occurred. She stated that the irate male had come in at least 3 times and Lt. Burke was requested to speak with him.  Lisa LaMonica states that she overheard the conversation that Lt. Burke had on his cell phone and stated he acted professionally and never yelled at the caller. She also stated that during his conversation he kept having to repeat himself.  Lisa LaMonica did not know who the caller was. When asked if she noticed if

*"Serving With Pride Since 1870"*

Lt. Burke had laryngitis Lisa LaMonica stated "yes. He had a scratchy voice".  When asked if she ever heard Lt. Burke use ethnic or racial slurs in the past Lisa LaMonica stated "No. Never".

Gail Russo stated the same story about the irate male at the window and that Lt. Burke was handling the issue calmly and professionally.  Gail Russo states that Lt. Burke received a phone call on his cell phone and that it had something to do with a tow. She states that she heard Lt. repeat himself as if the person on the phone continued to ask the same question over and over again. Gail Russo also stated Lt. Burke acted professionally and never yelled at the caller. Gail Russo also stated that at the end of the call she stated to Lt. Burke "You have a lot of patience. That sounded like a frustrating call".

Gail Russo was only person in central records when the incident between Lt. Burke and Capt. Hamilton occurred. Gail Russo states she initially heard Capt. Hamilton in the hallway near the bathroom with a raised voice trying to explain a story to someone but did not know who he was speaking with. She then states Lt. Burke and Capt. Hamilton came into central records and were having a heated discussion. When asked Gail Russo stated that she did not know what the content of the conversation was because she was "Trying to tune them out". She then hears Lt. Burke say "That little guinea is lying" at this time both Lt. Burke and Capt. Hamilton were yelling at each other. When asked if she ever hear Lt. Burke state he was going to "kill that guinea" Gail Russo stated "No. I would have remembered that" When asked how many times Lt. Burke said "Guinea" she stated "I only heard it once". Gail Russo also stated that Lt. Burke came into central records the next day and apologized for using the term "guinea". Gail Russo stated that her father is Italian and her husband is Italian and did not take offence. When asked Gail Russo stated that she has never heard Lt. Burke use ethnic or racial slurs in the past and that she had never seen Lt. Burke mad.

Respectfully Submitted,

Lt. Demetri N. O'Malley

*"Serving With Pride Since 1870"*