UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH PEPICELLI,
Plaintiff,

v.

CIVIL ACTION NO. 23-12406-MPK[1]

EVERETT POLICE DEPARTMENT,
CITY OF EVERETT,
POLICE CHIEF STEVEN MAZZIE,
and LIEUTENANT NEIL BURKE,
Defendants.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT (##41, 42, 45)

KELLEY, U.S.M.J.

I. Introduction.

Plaintiff Joseph Pepicelli, a retired police officer, brings claims against his former employer, the City of Everett, and the Everett Police Department ("EPD"), as well as Police Chief Steven Mazzie, who is now retired, and Neil Burke, then a lieutenant, related to alleged discrimination based on the Plaintiff's Italian heritage. He brings claims against the City, the EPD, and Chief Mazzie, but not Burke, related to disability discrimination and retaliation.[2] The claims relate to events that occurred over several years. A detailed introduction is in order.

The Plaintiff claims that he is disabled due to a fall in February 2015, which happened while he was working, which required shoulder surgery. His injuries were exacerbated by a fall in

[1] With the parties' consent, this case was reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c). (##16, 17.)

[2] The Plaintiff filed the complaint, which is not verified under pain and penalties of perjury, on September 21, 2023, in the Massachusetts Superior Court for Middlesex County. *See* #1-1; *see also* #5 at 4; *id.* at 5-18. The Defendants removed the case pursuant to 28 U.S.C. §§ 1331 and 1441. (#1 ¶ 5.)

the EPD parking lot in March 2017 and another fall while he was working in June 2019. The Plaintiff alleges that the City, the EPD, and Chief Mazzie discriminated against him based on his disability when Chief Mazzie denied him disability benefits. Specifically, the Plaintiff alleges that in August 2017, Chief Mazzie denied him leave without loss of pay and indemnification of medical expenses related to the March 2017 fall. Of note, Chief Mazzie's denial of these requests for disability benefits was overturned, and the Plaintiff in fact took leave.

The Plaintiff also alleges that from June to September 2020, he tried to make physical therapy and medical appointments but was not able to, because Chief Mazzie refused to indemnify the expenses. In addition, the Plaintiff alleges disability discrimination because in December 2020, Chief Mazzie initiated involuntary retirement proceedings rather than allowing the Plaintiff to retire due to disability. The City's application for involuntary retirement was based on letters from the Plaintiff's medical providers in October 2020 which stated that he was unable to return to work. Significantly, the Plaintiff did ultimately retire due to disability. The City's application was denied and the Plaintiff's subsequent application for accidental disability retirement was approved.

The Plaintiff alleges that he was subject to discrimination based on his Italian heritage on August 20, 2019, when Burke referred to him as a "guinea," outside his presence, and when Chief Mazzie delayed an investigation into the August 20, 2019 incident and then, around November 2019, failed to discipline Burke despite the fact that witnesses confirmed that Burke used the slur and Burke admitted using it. Burke apologized to the Plaintiff, and they did not interact again.

As for retaliation, the Plaintiff complained to then Mayor Carlo DeMaria about Chief Mazzie's initial denial of his requests for disability benefits in August 2017. The Plaintiff also complained to Mayor DeMaria sometime between August 20, 2019, and early November 2019, about Burke's use of the slur. The Plaintiff alleges retaliation based on his complaints to Mayor

DeMaria when from June to September 2020, Chief Mazzie refused to indemnify expenses and then in December 2020, initiated involuntary retirement proceedings.

Before the court are cross-motions for summary judgment: the Plaintiff's motion for partial summary judgment on the claim of heritage discrimination against all defendants (#41); Burke's motion for summary judgment on all claims against him, which, as noted, relate to heritage discrimination, not disability discrimination or retaliation (#42); and the City, the EPD, and Chief Mazzie's motion for summary judgment on all claims (#45). The cross-motions present many questions, though the main questions are whether the Plaintiff's claims are timely and whether there is sufficient evidence that he was subjected to adverse employment actions and of discriminatory and retaliatory animus and causation. The Plaintiff has failed to make much of the evidence that was promised in his complaint part of the summary judgment record, and his briefing in support of and opposition to summary judgment provides little assistance in answering the questions presented. On careful review of the evidence that has been made part of the record and controlling precedent, the court denies the Plaintiff's motion; allows Burke's motion; and allows the City, the EPD, and Chief Mazzie's motion except as to the claim of civil conspiracy against Chief Mazzie, as to which the court will enter summary judgment for Chief Mazzie sua sponte unless by November 13, 2026, the Plaintiff identifies evidence raising a triable issue of fact on that claim.

II. <u>The Claims</u>.

In Count I the Plaintiff alleges that in violation of Mass. Gen. Laws ch. 151 ("Chapter 151B"), § 4(16), the City, the EPD, and Chief Mazzie discriminated against him based on his disability by "refus[ing] to acknowledge [his] disability claims," "deny[ing] [him] necessary medical treatment," and "forc[ing] [him] to voluntarily retire rather than allow[ing] him to retire

due to his disability." (#1-1 ¶¶ 71-73.) The court understands the Plaintiff to be alleging that his requests for disability benefits were not "acknowledge[d]" and that he was "den[ied] necessary medical treatment" in August 2017 when Chief Mazzie denied leave without loss of pay and indemnification of medical expenses related to the March 2017 fall and also from June to September 2020 when the Plaintiff was attempting to schedule physical therapy and medical appointments and Chief Mazzie refused to indemnify expenses. *Id.* ¶¶ 13-37. Count IV, under the Americans with Disabilities Act ("ADA"), "42 U.S.C. § 12101," also against the City, the EPD, and Chief Mazzie, is based on these same allegations. (#1-1 ¶¶ 88-92.)

In Count II the Plaintiff alleges that the City, the EPD, Chief Mazzie, and Burke discriminated against him based on his Italian heritage in violation of § 4(1) of Chapter 151B. He alleges that Burke called him a "guinea" on many occasions and stated, on August 20, 2019, that he was going to "'kill that fuckin' Guinea.'" Chief Mazzie, according to the Plaintiff, was aware of the harassment but delayed investigating it and then failed to discipline Burke after the investigation, creating a hostile work environment. (#1-1 ¶¶ 38-58, 75-80.) Count V is a claim for negligent supervision against the City, the EPD, and Chief Mazzie, because they owed the Plaintiff a duty of care to protect him from Burke, but allegedly took no action in response to reports of harassment. *Id.* ¶¶ 93-96.

In Count III the Plaintiff alleges that in violation of Chapter 151B, § 4(4), the City, the EPD, and Chief Mazzie retaliated against him for complaining to Mayor DeMaria around August 2017 about the denial of his requests for disability benefits and again around November 2019 about Burke's use of the slur. (#1-1 ¶¶ 16-17, 47-48, 81-87.) The Plaintiff alleges that when he asked Chief Mazzie if Chief Mazzie was ordering him to involuntarily retire instead of allowing him to

retire due to disability because he had previously complained to the Mayor, Chief Mazzie replied: "'[Y]ep, you made your bed, now sleep in it.'" *Id.* ¶¶ 60-61, 84.

Count VI is a claim for negligent infliction of emotional distress against the City, the EPD, Chief Mazzie, and Burke. The claim is based on Burke's use of the slur and the allegedly inadequate response to it, as well as the alleged denial of necessary medical care and "eventual forced retirement." *Id.* ¶¶ 97-102.

Count VII is a claim under 42 U.S.C. § 1983 against the City, the EPD, Chief Mazzie, and Burke based on "discrimination" and other "improper conduct." (#1-1 ¶¶ 103-108.) Count VIII is a claim for civil conspiracy against the City, the EPD, and Chief Mazzie. *Id.* ¶¶ 109-113.

III. Legal Standard.

Summary judgment is intended to "pierce the boilerplate of the pleadings" and assess the parties' proof to determine whether trial is actually required. *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 450 (1st Cir. 2014). A motion for summary judgment must be allowed if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of asserting the absence of any genuine dispute of material fact, by affidavits, admissions, or other materials of evidentiary quality. *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). A dispute of fact is "genuine" if a reasonable jury could resolve the dispute in favor of either the moving party or the non-moving party. *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008). A fact is "material" if it has the capacity to affect the outcome of the case. *Id.*

If the moving party meets this initial burden of asserting the absence of any genuine dispute of material fact, then the non-moving party must show that a genuine dispute of material fact exists,

"but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (cleaned up) (citation omitted).

On a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party. *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20-21 (1st Cir. 2018). Where, as here, the parties cross-move for summary judgment, the court must consider each motion separately, viewing the record and drawing reasonable inferences against each moving party in turn. *Id.* at 21. Ultimately, where the record taken as a whole could not lead a reasonable jury to find for the non-moving party, there is no genuine dispute of material fact and trial is not required. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

IV. Facts.[3]

On July 24, 2006, the EPD hired the Plaintiff, then forty-seven years old, as an officer. (#50-1 ¶ 1.) The Plaintiff, who is of Italian heritage, was previously an officer with the Boston Municipal Police Department. *Id.* Chief Mazzie was Chief of Police of the EPD and Burke held the rank of lieutenant during all relevant times. (#49 ¶¶ 3-5; #51-1 ¶ 1.)

A. The Limited Evidence of the Process for Requesting Leave without Loss of Pay and Indemnification or Reimbursement of Medical Expenses and the Incomplete Documentary Record of the Plaintiff's Requests for Disability Benefits.

[3] The facts are drawn from: the Plaintiff's statement of facts (#41-2) and the Defendants' response (#49); the City, the EPD, and Chief Mazzie's statement of facts (#47) and the Plaintiff's response (#50-1); Burke's statement of facts (#44) and the Plaintiff's response (#51-1); exhibits attached to Plaintiff's motion, including his affidavit in support of partial summary judgment (#41); exhibits attached to the City, the EPD, and Chief Mazzie's memorandum of law (#46); and exhibits attached to Burke's memorandum of law (#43). The court notes when facts are in dispute.

The Plaintiff agrees that during his employment with the EPD he sought "injured on duty" leave without loss of pay under Mass. Gen. Laws ch. 41, § 111F,[4] roughly nine times, and also sought various reimbursements for medical expenses under Mass. Gen. Laws ch. 41, § 100.[5] (#50-1 ¶ 2.) The evidence in the record regarding the process for requesting leave without loss of pay and indemnification or reimbursements of medical expenses is limited. During discovery, Chief Mazzie admitted that he had training in processing § 111F requests (which he distinguished from requests under § 100, *see* #41-4 at 34 (¶ 36)) and that requests were submitted to him and he would review them, including medical records, and decide whether to "preliminarily" approve or deny the claims or to "send [them] back." The paperwork would also be sent to a third-party claims administrator. Chief Mazzie reviewed about 150 to 200 § 111F requests and "approved the vast majority…as long as all of the paperwork was included and there was supporting documentation." *Id*. at 33-34 (¶¶ 28-33).[6]

The City, the EPD, and Chief Mazzie have submitted as an exhibit applications for leave without loss of pay under Mass. Gen. Laws ch. 41, § 111F, and for indemnification under Mass. Gen. Laws ch. 41, § 100, that appear to have been signed by the Plaintiff, and for some of those

---

[4] This statute provides in relevant part that "[w]henever a police officer…is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own…he shall be granted leave without loss of pay for the period of such incapacity…." *Id.*

[5] This statute provides in relevant part that "[u]pon application" by a police officer, the board or municipal official with authority to appoint police officers "shall determine whether it is appropriate under all the circumstances for" the city "to indemnify" the police officer "for his reasonable…medical…expenses…incurred as the natural and proximate result of an accident occurring or of undergoing a hazard peculiar to his employment, while acting in the performance and within the scope of his duty without fault of his own…." *Id.*

[6] The only other evidence in the record regarding this process is the Plaintiff's deposition testimony that whether to deny requests for disability benefits "wasn't really up to" Chief Mazzie. "It was up to the doctors and the city…." (#46-5 at 8.)

applications, forms that appear to reflect Chief Mazzie's "preliminar[y]" decisions on the applications.[7] These documents are dated between 2006 and 2019. *See* #46-1. The Plaintiff's applications for leave without loss of pay and indemnification after 2019, if he filed any, have not been made part of the summary judgment record.

In addition to those related to the falls in February 2015, March 2017, and June 2019, discussed below, the exhibit includes applications and/or the forms reflecting Chief Mazzie's decisions dated in 2006, 2008, 2010, 2013, 2014, March 2017, and April 2017.

The exhibit includes an application for leave without loss of pay dated September 19, 2006. No decision corresponding to this application is included in the exhibit. (#46-1 at 20.)

The exhibit includes a decision ("Approved for payment and being paid") related to a November 18, 2008 application for either leave without loss of pay or indemnification, or both. The application(s) is not included in the exhibit. *Id*. at 19.

The exhibit includes a decision ("Approved for payment and being paid") related to a June 26, 2010 application for either leave without loss of pay or indemnification, or both. The application(s) is not included in the exhibit. *Id*. at 21.

The exhibit includes applications for leave without loss of pay and indemnification dated February 11, 2013, and no apparent corresponding decision. *Id*. at 17-18.

The exhibit includes applications for leave without loss of pay and indemnification dated February 4, 2014. *Id*. at 15-16. Chief Mazzie decided to "Forward[] without recommendation," meaning "NOT being paid under '111F' at present," writing in the comments section of the form: "Not treated and no medical documentation. Will be placed on file." *Id*. at 14.

[7] The forms are titled "CLAIMS UNDER M.G.L. CH. 41, ss 100 AND 111F."

The exhibit includes a decision ("Forwarded without recommendation") related to a March 5, 2017 application for either leave without loss of pay or indemnification, or both. The application(s) is not included in the exhibit. Chief Mazzie wrote: "Officer was not bitten or sprayed by [perhaps "animal"] and did not go to hospital night of incident. Appears he went for medical attention days later to get rabies shot. Not sure how you want to handle." *Id.* at 8.

The exhibit includes applications for leave without loss of pay and indemnification dated April 24, 2017, and no apparent corresponding decision. *Id.* at 9-10.

B. Beginning February 2015: The Plaintiff injures his shoulder in a fall, requests disability benefits, and goes on leave, during which he has surgery.

In February 2015, the Plaintiff reported an injury to his shoulder from a fall on steps. The Plaintiff went on "injured on duty" leave from February 3, 2015 to April 4, 2016. (#50-1 ¶ 3); *see also* #46-1 at 11-13 (what appear to be the relevant applications and the corresponding approval by Chief Mazzie). During that leave, the Plaintiff underwent shoulder surgery. (#50-1 ¶ 3.)

C. March-December 2017: The Plaintiff falls again and his later requests for disability benefits are initially denied by Chief Mazzie but subsequently approved after the Plaintiff complains to Mayor DeMaria.

On August 21, 2017, the Plaintiff requested "injured on duty" leave for injuries he sustained in March 2017 in a slip and fall on black ice in the EPD parking lot. (#50-1 ¶ 4.) The documentary record shows that two days after the Plaintiff applied for leave without loss of pay under Mass. Gen. Laws. ch. 41, § 111F, and indemnification under Mass. Gen. Laws ch. 41, § 100, *see* #46-1 at 5-7, Chief Mazzie "disapprove[d]" the applications, writing:

> Although officer slipped on ice on day in question, he did not seek medical attention, miss work or apply for 111F benefits until over 5 + months had gone by. During some period [sic] he was able to work regular hours of duty, details, O.T. shifts, workout and travel to Europe without a problem.

*Id*. at 5;[8] *see also* #41-4 at 35 (¶ 43).

The Plaintiff, however, agrees that the third-party claims administrator, Cook & Company, approved the request on September 6, 2017, and the Plaintiff in fact took "injured on duty" leave from August 2017 to December 28, 2017. (#50-1 ¶ 5); *see also* ##46-3, 46-4. The Plaintiff has not produced evidence that he was unable to attend medical appointments between August 23 and September 6, 2017. Nor has he produced evidence of any out-of-pocket expenses incurred in this roughly two-week span.

According to the Plaintiff's June 3, 2021, administrative complaint to the Massachusetts Commission Against Discrimination ("MCAD"),[9] as to this August 2017 claim for disability benefits, the Plaintiff "had to get help from the mayor…." (#43-4 at 3.)

D. <u>Beginning June 2019: The Plaintiff falls again, requests disability benefits, and goes on leave</u>.

In June 2019, the Plaintiff requested leave without loss of pay. *See* #46-1 at 3-4 (that application as well as the one for indemnification). The Plaintiff apparently injured his back, hip, and knee when he was knocked to the ground during an arrest. *See* #46-2 at 3 (as recounted in the Plaintiff's application for accidental disability retirement). The request was granted. *See* #46-1 at 2 (Chief Mazzie's approval). The Plaintiff was subsequently cleared to return to work. (#50-1 ¶ 6.)

E. <u>The August 20, 2019 Incident and Aftermath</u>.

[8] A note at the bottom of this form reads "*Headquarters video capture slip + fall." *Id*.

[9] Although his MCAD complaint is unsigned, *see* #43-4 at 4, the Plaintiff appears to have complied with the MCAD's COVID-related instructions for verifying it under pain and penalties of perjury. *Id*. at 5-6.

On August 20, 2019, the Plaintiff was working a detail near a construction site when he called the police to try to resolve an issue with towed vehicles and spoke to Burke. (#50-1 ¶¶ 7-8.) The parties do not agree on what the tone of the conversation was. The Plaintiff reported the conversation to EPD Captain Paul Hamilton, who then confronted Burke about it. It is undisputed that the Plaintiff was not present when Hamilton confronted Burke. *Id.* ¶¶ 9-10; *see* #51-1 ¶ 5. Accounts of that confrontation diverge, *see supra*, but it is undisputed that during the confrontation, Burke called the Plaintiff a "guinea." (#50-1 ¶ 10); *see* #51-1 ¶ 3.

After learning about the August 20, 2019 incident, the Plaintiff told Mayor DeMaria about it. (#50-1 ¶ 11; #51-1 ¶ 6.)[10] Mayor DeMaria, in turn, asked Chief Mazzie to take action. (#50-1 ¶ 12; #51-1 ¶ 7.)[11] The Plaintiff attests in his affidavit in support of partial summary judgment that Chief Mazzie asked the Plaintiff why he "went to the Mayor" and said: "[N]ow I can't squash this." (#41-3 ¶ 17.)

There are written statements from Hamilton, the Plaintiff, and Burke in the record.[12] Hamilton's statement is dated October 22, 2019, about two weeks before the email from Mayor

[10] In his affidavit in support of partial summary judgment, the Plaintiff attests that he "reported the incident to appropriate channels, including escalating the issue to the Mayor's Office." (#41-3 ¶ 11.) In his MCAD complaint, he attested that Hamilton "reported these slurs" to Chief Mazzie and Chief Mazzie then asked the Plaintiff to write a statement on his issues with Burke, which the Plaintiff did. According to the Plaintiff's MCAD complaint, Chief Mazzie took no action in response to the Plaintiff's written statement and about a week after the August 20, 2019 incident, the Plaintiff ran into Mayor DeMaria on the street and told him about it. (#43-4 at 3.)

[11] Chief Mazzie testified at his deposition that he thought he received an email from Mayor DeMaria at the same time that he received a call from a staff assistant for the Mayor. (#43-3 at 6.) The email from Mayor DeMaria in the record is dated November 4, 2019. He wrote: "Would like them both to come in with their union reps if they want and Paul Hamilton (if available) regarding the use of the word Guinea." (#41-4 at 47.)

[12] The City, the EPD, and Chief Mazzie's statement of facts implies that Chief Mazzie ordered an officer to investigate the August 20, 2019 incident after Mayor DeMaria told him to take action and then these statements were collected. The Plaintiff does not dispute the implication, *see* #50-

DeMaria to Chief Mazzie. Hamilton wrote in part that Burke said: "'I'm gonna kill that fucken guinea'" and when Hamilton told him to calm down, Burke repeated: "'No, I think I'm really going to kill that fucken Guinea.'" (#41-4 at 53.)

The Plaintiff's statement, which is not sworn, includes a description of the August 20, 2019 incident, as well as other incidents involving Burke. *Id.* at 49-52.[13]

In his statement, dated November 7, 2019, Burke admitted to saying when Hamilton confronted him: "'Because of that little Guinea asshole liar'" and "That little Guinea asshole lied about me!'" (#41-4 at 54-57.)

By memorandum dated November 18, 2019, the officer whom Chief Mazzie directed to investigate the August 20, 2019 incident recounted statements of witnesses interviewed on that date. Only one of the witnesses overheard Hamilton's confrontation of Burke. She stated that she

1 ¶ 13, but that implication is not consistent with the Plaintiff's MCAD complaint or the date on Hamilton's statement.

[13] The Plaintiff's statement describes two other incidents during which Burke used the term "guinea." The first incident happened before the Plaintiff joined the EPD, when Burke and the Plaintiff were at a gym and were talking, and Burke referred to the Plaintiff's brothers as "'Fucken guinea's.'" *Id.* at 49. During the second incident, on an unspecified date and at which the Plaintiff was not present, Burke saw a sticker on the Plaintiff's personal vehicle and asked Hamilton, "Is that a guinea thing?" *Id.* at 50. The parties have not stipulated that these two other incidents occurred. *See* ##49, 50-1, 51-1. The Plaintiff's affidavit in support of partial summary judgment does not detail any incident during which Burke used the term "guinea" other than the August 20, 2019 incident. *See* #41-3. In his MCAD complaint, the Plaintiff asserted that "[s]ince [he] started working [at the EPD], [Burke]…has called [him] insulting names based on [his] Italian heritage including 'Guinea.'" (#43-4 at 3.) Other than the August 20, 2019 incident, however, the Plaintiff's MCAD complaint does not go into detail as to any other incidents, including when they occurred.

The only other potentially relevant submission by the Plaintiff is a conclusory statement in his affidavit in support of partial summary judgment that because Burke was not disciplined for using the slur on August 20, 2019, the Plaintiff's "work environment became uncomfortable and hostile and [he] felt unsupported by the Department's leadership." (#41-3 ¶¶ 13-14.)

heard Burke say: "'That little guinea is lying.'" She denied that she heard him say: "'kill that guinea.'" *Id*. at 58-59.

The Plaintiff agrees that after the investigation, Burke apologized to him for using the slur. (#50-1 ¶ 14; #51-1 ¶ 8.) According to Burke and Chief Mazzie's deposition testimony, the apology occurred at a meeting conducted by Chief Mazzie and also attended by the investigating officer. (#46-7 at 9; #46-8 at 4.)[14] The Plaintiff agrees that he and Burke had no interactions after the meeting. (#50-1 ¶ 15; #51-1 ¶ 9.) The Defendants agree that Burke was not disciplined for using the slur. (#49 ¶ 15.)

F. <u>June-September 2020: The Plaintiff reaches out to Chief Mazzie about indemnification for physical therapy he states is related to the March 2017 fall; Chief Mazzie asks for more information but the Plaintiff apparently does not provide any; Chief Mazzie denies an indemnification request for an appointment that the doctor asserts is related to the February 2015 fall</u>.

On June 10, 2020, the Plaintiff attempted to schedule an appointment with his physical therapist (Amanda Tetreault, *see* ##46-10, 46-11) to treat neck and back pain. (#50-1 ¶ 16.)[15]

Two emails that the Plaintiff sent to Chief Mazzie simultaneously on the evening of July 10, 2020, have been made part of the summary judgment record. In one email, the Plaintiff wrote to Chief Mazzie, copying others:

---

[14] It is not clear from the record exactly when this meeting was held, but the Plaintiff has not produced any evidence to refute the inference that the meeting was held shortly after November 4, 2019, when Mayor DeMaria emailed Chief Mazzie.

[15] Emails between the Plaintiff and Ms. Tetreault have been been made part of the summary judgment record. In an email dated June 10, 2020, the Plaintiff wrote that confusion had been caused by the City switching from Cook & Company to Meditrol and that Meditrol was claiming that it did not receive paperwork but Cook & Company was claiming that it sent paperwork. He also wrote: "I was ordered by my Chief to resubmit the 11F paperwork (Similar to Workman's Comp) over 30 days ago but still never got an answer." (#46-10); *see also* #46-11 (in undated email: "…I went over the issue with Chief Mazzie who now states that he has no idea what I am talking about and he [is] now calling the incident from the fall at the back of the station a new injury").

> At your request I resubmitted a 111F packet for a prior injury that had been previously approved by the City under 111F. As of this date I still have not received a response [whether] the packet has been approved or denied. I am seeking medical attention for this injury and need to know the status.
>
> Please provide me with the information that I requested as soon as possible.

(#46-12) (capitalization normalized). As noted above, the exhibit including the applications for "injured on duty" leave without loss of pay and indemnification or medical reimbursement does not include applications after 2019. *See* #46-1.

In the other email to at least Chief Mazzie the evening of July 10, 2020, the Plaintiff mentioned a call with Chief Mazzie; claimed that Chief Mazzie said: "'The City of Everett should not have approved [the Plaintiff's] injury'"; explained that Ms. Tetreault told him (the Plaintiff) that "the case number for [his] 111F injury was not working for some reason" and instructed him to call City Hall to find out why; explained the various calls he then made; blamed Chief Mazzie for "halt[ing]" treatment he had been receiving for the injuries he sustained in the March 2017 fall; and explained that he had an upcoming appointment with his spine specialist (David Binder, *see* #46-16), who would need the case number. (#46-14 at 3) (capitalization normalized).

The next morning, July 11, 2020, Chief Mazzie responded to the Plaintiff, copying others:

> Officer Pepp
>
> To date I do not have any information from a new incident or information that tells us what your claim is other than your back hurts.
> You were cleared and returned to duty and [I] have no knowledge of you having [ongoing] treatment. Could you provide documentation in writing as to what your issue is and what treatment you are looking for please.

(#46-13 at 2.)

On July 30, 2020, Chief Mazzie forwarded the Plaintiff's second July 10, 2020 email above, as well as his response, above, to the claims administrator, *see* #50-1 ¶ 19, writing, in part:

> You will see he is not using the 2015 injury but the 2017 back parking lot slip and fall on ice that I denied as it was submitted 5 months after the fact. This is the one that Vetrano then overruled. It was handled by Cook and Co. Not sure if they forwarded this case over to you but they should have.
>
> [I've] held off sending the draft you sent me as I advised in my response for him to gather me some info. Wanted to see if you had this case [on] file for review before we proceed.

(#46-13 at 2.) There is no evidence that the Plaintiff provided Chief Mazzie with additional information between July 11 and September 1, 2020.

On September 1, 2020, Chief Mazzie wrote the Plaintiff a letter, with the subject: "Preliminary Denial -- Right Shoulder." (#46-14 at 2); *see also* #50-1 ¶ 20. Chief Mazzie explained that he received a request from Dr. Alan Curtis[16] to authorize the scheduling of an appointment with the Plaintiff and that the appointment be deemed job-related. (#46-14 at 2.) Chief Mazzie wrote that the "reference," presumably by Dr. Curtis's office, was to a February 2, 2015, date of injury involving the Plaintiff's shoulder but based on the City's records, that shoulder injury had been treated with surgery and had fully healed and the Plaintiff returned to full, unrestricted duty. Chief Mazzie also wrote that based on the City's records, there was no ongoing treatment for the shoulder injury and there had not been a new re-injury. *Id*. The letter does not mention the March 2017 fall but does mention the June 2019 fall: "Medical notes…document that you had full range of motion of your shoulders and that your injury involved your 'back, knee, elbow, hip and ass.'" *Id*.

Chief Mazzie wrote:

> …At this time I have found no factual or medical specifics that would suggest that your current claim [] is causally connected to your 02/02/2015 injury. I have asked you a number of times to articulate what issues you are having at this point and why

[16] The Plaintiff identifies Dr. Curtis as the surgeon who operated on his shoulder in 2015. (#1-1 ¶ 36); *see also* #46-2 at 4. If Dr. Curtis's request was made to Chief Mazzie in writing, that writing has not been made part of the summary judgment record.

> they would be connected to your 2/2/2015 incident, but to date, I have not received anything.
>
> Taking into consideration the criteria set forth in M.G.L. Chapter 41, Section 100, and relating it to the absence of factual and medical specifics provided to date, I am hereby preliminarily denying your appointment with Dr. Curtis as a line of duty matter.
>
> If you feel that you require medical treatment, you should, by all means obtain such treatment. The costs for such treatment should be paid for through your group health insurance benefit. Any time off will be paid as accrued personal sick leave to the extent available.
>
> You should be aware that if you are able to provide additional factual and medical documentation that acceptably documents that your current surgery was the direct result of an accident occurring or a hazard peculiar to your employment while acting in the performance and within the scope of your duties on that date, I will certainly reconsider my decision….

*Id*. at 2-3.

G. <u>October 2020: The Plaintiff submits letters from providers stating that the Plaintiff is unable to return to work as a police officer</u>.

There is no evidence that the Plaintiff provided Chief Mazzie with any additional information between September 1 and mid-October 2020. On October 17, 2020, the Plaintiff called in sick. (#50-1 ¶ 21.) After that, he submitted letters from three providers stating that he was unable to return to work as a police officer. *Id*.; *see* ##46-15, 46-16, 46-17.

On October 19, 2020, Dr. Binder, with the Massachusetts General Hospital ("MGH") Department of Orthopedic Surgery, wrote that the Plaintiff "continues to have treatment for both neck and lower back pain." (#46-16.) Dr. Binder "recommend[ed] [the Plaintiff] to not return to work," adding that the Plaintiff "will not be able to safely perform [his] duties of police officer." *Id.*

On October 21, 2020, Ms. Tetreault, with the MGH Sports Medicine Service, wrote that she was treating the Plaintiff "for recurring neck and low back pain with radiculopathy" and after

describing his symptoms and efforts to manage them, stated: "The severity of his symptoms has progressed over time and again, correlate to his line of work. It is recommended that Joe stay out of work to maximize healing and strength potential, refrain from re-injury and avoid invasive interventions." (#46-17.)

Also on October 21, 2020, Paul Ketro, a physician at MGH's North End Adult Medicine, wrote:

> It is my medical opinion that Joseph Pepicelli is unable to return to work as a police officer.
>
> He sustained an injury at work in March, 2017 and since then has had ongoing treatment with physical therapy and has seen various specialists. His symptoms are worsened by things such as long sitting in a car, wearing a gun belt, standing to take statements etc. and his symptoms have progressed. He has tried to work but his symptoms have worsened.

(#46-15.)

The Plaintiff argues that Ms. Tetreault's letter supported the request for indemnification related to the appointment with Dr. Curits. *See* #50-1 ¶ 20 (citing #46-17).[17] During October, November, and December 2020, the Plaintiff exhausted all sick and vacation time. *Id.* ¶ 22; *see also* #46-18.

H. <u>December 2020 - February 2021: Chief Mazzie files an involuntary retirement application to which the Plaintiff objects and which is denied before the Plaintiff files a voluntary retirement application and then seeks accidental disability retirement</u>.

[17] The Plaintiff was shown Ms. Tetreault's letter at his deposition and he testified that he submitted the letter because Chief Mazzie "was denying [him his] ability to go out on -- on 111F." (#46-5 at 4.) Again, the relevant exhibit, which includes the applications for leave without loss of pay under Mass. Gen. Laws ch. 41, § 111F and indemnification under Mass. Gen. Laws ch. 41, § 100, does not include applications after 2019. *See* #46-1. No other evidence suggests that from June to September 2020, the Plaintiff was requesting leave, as opposed to indemnification. To the contrary, in one of his emails to Chief Mazzie, the Plaintiff wrote: "Under 111F, I can still continue treatment from my injury at the station while I am working." (#46-13 at 3) (capitalization normalized).

On December 18, 2020, the EPD filed an application with the Everett Retirement Board, signed by Chief Mazzie, for the Plaintiff's involuntary superannuation retirement pursuant to Mass. Gen. Laws ch. 32, § 16. (#46-19); *see* #50-1 ¶ 23. The application explained the basis on which retirement was sought:

> …During the month of October, 2020, I [Chief Mazzie] received correspondence from Officer Pepicelli's treating physician documenting that because of safety reasons he would no[] longer be able to continue in his capacity as a Police Officer.
>
> Given the above, I hereby respectfully request that this application be processed as set forth in M. G. L. Chapter 32, Section 16, so that Officer Pepicelli may receive the retirement he is entitled to and I can free up a slot for an individual capable of reporting for duty as scheduled and as required based on the staffing, operational and public safety needs of the City of Everett.
>
> I have been advised that if Officer Pepicelli feels that he is eligible for an accidental disability retirement he is free to seek one and if ultimately granted, he would be made whole back to the date of his superannuation retirement.

(#46-19 at 8.)

On December 31, 2020, the Plaintiff, through an attorney, objected to the City's application for involuntary superannuation retirement and requested a private hearing with the Everett Retirement Board. *See* #50-1 ¶ 24 (no response); *see also* #46-20. The attorney wrote, in part:

> …We are hopeful that it was a typographical error, but for the record, Mr. Pepicelli strongly objects to this involuntary retirement for superannuation retirement benefits because the injuries for which Chief Mazzie rely upon [were] sustained while in the performance of his duties as an Everett Police Officer. What is more troublesome is that the police department is well aware of his disabling injuries and that they occurred on duty. Moreover, the filing for involuntary retirement for superannuation upon a 62 year-old smacks of age discrimination….

(#46-20.)

On January 27, 2021, the Everett Retirement Board denied the City's application for involuntary superannuation retirement, and the Plaintiff was reinstated. (#50-1 ¶ 25.) Pursuant to

the collective bargaining agreement, the Plaintiff was granted additional sick and vacation time on reinstatement. *Id*.

The Plaintiff exhausted the additional sick and vacation time on February 21, 2021. *Id.* ¶ 26.[18] On that date, he filed an application for voluntary superannuation retirement. That application was later amended to seek accidental disability retirement. *Id.* ¶ 27; *see also* ##46-21, 46-2. In support of the amended application, the Plaintiff, through the attorney, identified the February 2015 fall as the cause of the Plaintiff's disabling injury which was aggravated by the falls in March 2017 and June 2019. (#46-2 at 2-4.)

I. <u>June 3, 2021: The Plaintiff files his MCAD complaint</u>.

On June 3, 2021, the Plaintiff filed the administrative complaint with the MCAD, alleging that the EPD discriminated against him based on his disability by not recognizing that he was disabled and denying his requests for disability benefits, and that the EPD retaliated against him due to his complaints about disability and ancestry discrimination. (#43-4 at 3-4.) The Plaintiff's MCAD complaint "lingered before the MCAD and the" Equal Employment Opportunity Commission and the Plaintiff "chose[] to remove the case from [the] MCAD and file it" in court pursuant to 804 C.M.R. §1.04(12). (#1-1 ¶¶ 65-66.)

J. <u>April 2022: The Plaintiff retires due to disability</u>.

In October 2021, the Plaintiff underwent the medical examinations required for accidental disability retirement. (#50-1 ¶ 28); *see generally* #46-2. On April 14, 2022, his application for accidental disability retirement was granted. (#50-1 ¶ 29.)

K. <u>September 21, 2023: The Plaintiff files suit</u>. *See* #1-1.

[18] The Plaintiff testified at his deposition that he was in the hospital in January 2021 and almost died from COVID. (#48-3 at 5.)

V. Discussion.

A. The Heritage Discrimination Claims Are Time-Barred.

The Defendants argue that the discrimination claims based on Burke's use of the slur on August 20, 2019, as well as the allegedly inadequate response to the incident, are time-barred. The City, the EPD, and Chief Mazzie also argue the events underlying the disability discrimination and retaliation claims, except the initiation of involuntary retirement proceedings on December 18, 2020, occurred outside the statutes of limitations. *See* #43 at 3-5; #46 at 6-7, 13-15. The court identifies the statutes of limitations applicable to the Plaintiff's claims and then addresses his "continuing violations" argument. *See* #50 at 2; #51 at 2. The court finds the continuing violations argument unpersuasive as to the heritage discrimination claims and enters summary judgment for the Defendants on them.

The continuing violations argument is more persuasive as to the disability discrimination and retaliation claims based on the denial of the Plaintiff's requests for disability benefits, and the court declines to enter summary judgment for the City, the EPD, and Chief Mazzie on those claims on the ground that they are time-barred. As discussed below, however, those claims, as well as the disability discrimination and retaliation claims based on the initiation of involuntary retirement proceedings, fail as a matter of law for other reasons.

1. The applicable statutes of limitations.

The Plaintiff's Chapter 151B claims (Counts I, II, and III) are subject to two statutes of limitations. A plaintiff alleging a Chapter 151B claim, either for discrimination or retaliation, cannot bring a civil action directly to court; the plaintiff must first file an administrative complaint with the MCAD. *Dunn v. Langevin*, 211 N.E.3d 1059, 1062 (Mass. 2023); *see Rae v. Woburn*

*Public Schs.*, 113 F.4th 86, 99 (1st Cir. 2024). The plaintiff must do so "within 300 days after the alleged act of discrimination." Mass. Gen. Laws ch. 151B, § 5; *see Dunn*, 211 N.E.3d at 1062.

Chapter 151B does not require that the plaintiff wait for a right-to-sue letter from the MCAD or the completion of the MCAD's investigation before he files suit. *Rae*, 113 F.4th at 99. Rather, ninety days after the filing of the administrative complaint with the MCAD, or sooner if the commissioner assents in writing, the plaintiff may bring a civil action to court, which will trigger the dismissal of the MCAD case. Mass. Gen. Laws ch. 151B, § 9; *see Dunn*, 211 N.E.3d at 1062. However, if a plaintiff chooses to bring the civil action, he must do so "not later than three years after the alleged unlawful practice occurred." Mass. Gen. Laws ch. 151B, § 9; *see Rae*, 113 F.4th at 99.

The City, the EPD, and Chief Mazzie argue that a three-year statute of limitations applies to the Plaintiff's ADA claim. *See* #46 at 6-7. If Count IV arises under Title II of the ADA, which prohibits public entities from discriminating by reason of disability, *see* 42 U.S.C. § 12132, the court agrees. Title II does not include a statute of limitations; the court must borrow the most analogous limitations period under Massachusetts law, *see Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 112, 118 (1st Cir. 2003); and the Plaintiff does not suggest an alternative limitations period. *See* #50 at 2; *see also Rae*, 113 F.4th at 99-100 (for Title II claim, adopting the three-year limitations period applicable to Chapter 151B claims).

If, however, Count IV arises under Title I of the ADA, which prohibits employers from discriminating on the basis of disability, *see* 42 U.S.C. §§ 12111(2), 12112(a), the court does not agree that the applicable statute of limitations is three years. Title I incorporates the limitations period under Title VII of the Civil Rights Act. 42 U.S.C. § 12117(a); *see Bonilla v. Muebles J.J. Alvarez, Inc.*, 194 F.3d 275, 278 (1st Cir. 1999); *see also Lane v. Massachusetts Essex Cty.*

*Sheriff's Dept.*, #1:24-cv-13091-AK, 2025 WL 1787622, at *1-2 (D. Mass. June 27, 2025). Under Title I, a plaintiff must file the administrative complaint within a 300-day limitations period, wait for an agency response to the administrative complaint, and file suit within ninety days of receiving that response. *Lane*, 2025 WL 1787622, at *1-2.

The First Circuit has not yet decided whether a public employee may bring an employment discrimination claim under Title II, governing disability discrimination by public entities, as opposed to Title I, governing disability discrimination by employers. *See Currie v. Group Ins. Comm'n*, 290 F.3d 1, 6-7, 9 (1st Cir. 2002); *see also Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 17 (1st Cir. 2006); *Connolly v. Woburn Public Schs.*, #1:22-cv-10695-JEK, 2025 WL 2777749, at *1, n.2 (D. Mass. Sept. 29, 2025). Most circuit courts, however, have held that a public employee may not bring an employment discrimination claim under Title II, and must bring the claim under Title I. *See Logie v. Massachusetts Bay Transportation Auth.*, 323 F. Supp. 3d 164, 168 (D. Mass. 2018) (collecting cases and joining the majority). The City, the EPD, and Chief Mazzie characterize the Plaintiff's ADA claim as arising under Title II. The Plaintiff did not wait for an agency response to the administrative complaint, *see* #1-1 ¶¶ 65-66, and thus he might also characterize his ADA claim as arising under Title II, which does not require administrative exhaustion. *See Mitchell v. Massachusetts Dept. of Corr.*, 190 F. Supp. 2d 204, 209 (D. Mass. 2002). But neither party has addressed this issue.

The Plaintiff's tort claims for negligent supervision (Count V), negligent infliction of emotional distress (Count VI), and civil conspiracy (Count VIII) are subject to three-year statutes of limitations. *Patsos v. First Albany Corp.*, 741 N.E.2d 841, 846, n. 6 (Mass. 2001) (negligent supervision); *Lanier v. President and Fellows of Harvard Coll.*, 191 N.E.3d 1063, 1074 (Mass. 2022) (negligent infliction of emotional distress); *Pagliuca v. City of Boston*, 626 N.E.2d 625, 628

(Mass. App. Ct. 1994) (civil conspiracy); *see* Mass. Gen. Laws ch. 260, § 2A (for tort claims); Mass. Gen. Laws ch. 258, § 4 (under the Massachusetts Tort Claims Act ("MTCA")).

The Plaintiff's 42 U.S.C. § 1983 claim is likewise subject to a three-year statute of limitations, as § 1983 does not include a statute of limitations; the court would have to borrow the limitations period under Massachusetts law for personal injury claims; and under Massachusetts law, the limitations period for personal injury claims is three years. *Nieves v. McSweeney*, 241 F.3d 46, 51 (1st Cir. 2001); *see* Mass. Gen. Laws ch. 260, § 2A.

2. <u>The heritage discrimination claims accrued outside the applicable statutes of limitations, and the Plaintiff's continuing violations argument is unpersuasive</u>.

Burke called the Plaintiff a "guinea" on August 20, 2019,[19] more than 300 days before the Plaintiff filed his MCAD complaint on June 3, 2021, and more than three years before the Plaintiff filed suit on September 21, 2023. The Plaintiff does not argue that he did not know, and could not have known, about this incident within the limitations periods. And the evidence shows that he knew about this incident no later than November 4, 2019, when Mayor DeMaria emailed Chief Mazzie because the Plaintiff complained about the incident. *See* #41-4 at 7; *see also* #50-1 ¶¶ 11-12; #51-1 ¶¶ 6-7. November 4, 2019, is also more than 300 days before the Plaintiff filed his MCAD complaint and more than three years before he filed suit.

As to heritage discrimination claims based on Chief Mazzie's delay in investigating Burke's use of the slur and failure to discipline him, the Plaintiff knew about the delay no later than November 4, 2019. And the Plaintiff does not argue that he did not know, and could not have

[19] The Plaintiff has not presented competent evidence of the two other alleged incidents involving Burke's use of the slur and in any event, the first occurred before the Plaintiff even joined the EPD, *see* #41-1 at 49, and the second, based on the evidence discussed below, did not occur after August 20, 2019. There is no evidence that these two other alleged incidents were reported before August 20, 2019.

known, about the failure to discipline less than 300 days before he filed his MCAD complaint and less than three years before he filed suit. The Plaintiff should have known that Chief Mazzie did not plan to discipline Burke when the meeting was held at which Burke merely apologized. *See* #50-1 ¶ 14; #51-1 ¶ 8; *see also* #46-7 at 9; #46-8 at 4. Although the record does not reveal precisely when this meeting was held, there is no evidence that it was held after August 7, 2020 (for purposes of a 300-day limitations period) or September 21, 2020 (for purposes of a three-year limitations period).

The Plaintiff asserts that in arguing that his heritage discrimination claims are time-barred, the Defendants "improperly characterize[] the conduct as a discrete, isolated act, and ignores the nature of [a] hostile work environment claim." (#51 at 2.) According to the Plaintiff, use of the slur "by a superior officer, combined with the employer's failure to take any corrective action, created a hostile work environment that did not end with the initial statement. The conduct was reported, investigated, and left unremedied, allowing its effects to persist." *Id*. The court rejects this argument for several reasons.

First and generally, as the First Circuit recently emphasized in a case involving alleged retaliatory harassment, raising a hostile work environment claim

> does not automatically entitle a plaintiff to rely on the continuing violations doctrine. In particular, a plaintiff may not disguise discrete acts of retaliation as a single retaliatory harassment claim comprised of temporally distant conduct, multiple forms of protected activity undertaken for various purposes, and several discrete adverse actions.

*Rae*, 113 F.4th at 105.

Second, the Plaintiff's focus on the "persist[ing]" "effects" of the putative heritage discrimination is misplaced. "A continuing violation is not [proven] if all that appears [from the evidence] is that the plaintiff continues to suffer from the ongoing effects of some past act of

discrimination." *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1018 (1st Cir. 1979) (alternations by this court) (under Title VII and the Age Discrimination in Employment Act); *see also Rae*, 113 F.4th at 103-105 (applying federal continuing violations doctrine precedent to Chapter 151B claims); *Wheatley v. Am. Tel. & Tel. Co.*, 646 N.E.2d 265, 268 (Mass. 1994) (the Massachusetts Supreme Judicial Court (SJC) is generally guided by federal anti-discrimination precedent when interpreting Chapter 151B).

When a plaintiff asserts that the refusal of requests to remedy the alleged discrimination were part of a continuous chain of misconduct, the plaintiff must allege facts giving some indication that the refusals were themselves separate civil rights violations; otherwise, a plaintiff could turn all adverse employment actions into "continuing violations" simply by pleading that he continued to protest the actions to no avail. *Goldman*, 607 F.2d at 1018, 1019. The Plaintiff's conclusory assertion in opposition to summary judgment on Count II that the continuing violations doctrine applies is insufficient.

The court has also considered the Plaintiff's arguments in favor of summary judgment on Count II. *See* #41-1 at 2-4. It finds, however, that the Plaintiff has not produced evidence from which a reasonable jury could find that Chief Mazzie's delay in investigating Burke's use of the slur and failure to discipline him were separate civil rights violations.

Under § 4(1) of Chapter 151B, it is an unlawful practice

> [f]or an employer, by himself or his agent, because of the…national origin…[or]…ancestry…of any individual to…bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment….

Mass. Gen. Laws ch. 151B, § 4(1). This section applies to "employer[s]," but individuals, whether supervisors, co-workers, or third parties, may be held liable by the sections that prohibit "any person to…interfere with another person in the exercise or enjoyment of any right granted or

protected by" Chapter 151B, *see* Mass. Gen. Laws ch. 151B, § 4(4A), and "any person, whether an employer or an employee or not, to aid [or] abet…the doing of any of the acts forbidden under" Chapter 151B, *see* Mass. Gen. Laws ch. 151B, § 4(5). *See also Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 50 N.E.3d 778, 793 (Mass. 2016).

Under § 4(4A), a plaintiff must prove that the defendant interfered with their rights under Chapter 151B in deliberate disregard of those rights. *Furtado v. Standard Parking Corp.*, 820 F. Supp. 2d 261, 278 (D. Mass. 2011).

> …[I]ndividuals may be held liable if: (1) they had the authority or the duty to act on behalf of the employer; (2) their action or failure to act implicated rights under the statute; and (3) there is evidence articulated by the [plaintiff] that the action or failure to act was in deliberate disregard of the [plaintiff's] protected rights allowing the inference to be drawn that there was an intent to discriminate or interfere with the [plaintiff's] exercise of his rights.

*Id.*

Under § 4(5), a plaintiff must prove, among other things, that the aider and abettor shared an intent to discriminate like that of the principal offender. *Lopez v. Commonwealth*, 978 N.E.2d 67, 82 (Mass. 2012).

Under § 4(1) against an employer, an employee must produce evidence from which a reasonable jury may infer: membership in a protected class; harm; discriminatory animus; and causation. *Verdrager*, 50 N.E.3d at 793. Employees typically rely on circumstantial evidence of discriminatory animus and causation, which courts evaluate under the three-stage, burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Verdrager*, 50 N.E.3d at 793. At the first stage, the employee must produce evidence of a prima facie case of discrimination, which would allow a jury to infer that he is a member of a protected class, that he performed his job at an acceptable level, and that he was terminated or otherwise subjected to adverse employment action. *Id*. The burden of production shifts to the employer at the second stage

to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* At the third stage, the burden of production shifts back to the employee to produce evidence that the employer's facially legitimate reason for the adverse employment action is not true but a pretext. *Id.*

As to claims for aiding and abetting under § 4(5) and interference under § 4(4A), no reasonable jury could find that Chief Mazzie had an intent to discriminate based on the Plaintiff's Italian heritage. *See Lopez*, 978 N.E.2d at 82; *Furtado*, 820 F. Supp. 2d at 278. There is no evidence that Chief Mazzie himself used the word "guinea." Nor is there evidence that he handled incidents involving other allegations of discrimination (e.g. Irish heritage or gender) differently, or that he required an officer who engaged in similar misconduct (i.e. using a slur in reference to, but outside the presence of, another officer) but based on another heritage or protected class to do more than apologize. There is no evidence of any policies and procedures for investigating and punishing an officer's use of derogatory language in reference to another officer, such that the court might consider whether some deviation from such policies and procedures suggests an intent on Chief Mazzie's part to discriminate based on the Plaintiff's Italian heritage.

Chief Mazzie's alleged statements to Burke during the investigation (that he was unhappy with Burke "for having done this" and that he was unhappy "for having to deal with this," *see* #41-1 at 3 (citing #41-4 at 24 (¶ 48) (Burke's admission)) are not evidence that Chief Mazzie harbored discriminatory animus. Neither are Chief Mazzie's alleged statements to the Plaintiff (asking why he went to Mayor DeMaria and stating "'now I can't squash this'"), *see id.* at 4 (citing #41-3 ¶ 17 (Plaintiff's affidavit)). "While ambiguous remarks may, under some circumstances, help to illuminate the summary judgment record, such remarks rarely suffice to conceive an issue of

material fact when none otherwise exists." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 743-44 (1st Cir. 1995)

Nor could any reasonable jury find a "hostile work environment" on this record. Discrimination prohibited by § 4(1) includes a hostile work environment, which "is one that is 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.'" *Cuddyer v. Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 937 (Mass. 2001) (quoting *College-Town, Div. of Interco., Inc. v. Massachusetts Comm'n Against Discrimination*, 508 N.E.2d 587, 591 (Mass. 1987)). The court assumes favorably to the Plaintiff, as it must on the Defendants' motion, that Burke's use of the slur was accompanied by a threat of violence, *see* #41-1 at 3 (citing #41-4 at 53 (Hamilton's statement)), but even still, he has not produced sufficient evidence that the heritage discrimination was pervasive or "pose[d] a formidable barrier to [his] full participation…in the workplace."[20] The conduct was exclusively verbal. *See Pomelas v. Celulares Telefonica, Inc.*, 447 F.3d 79, 84 (1st Cir. 2006) (regarding sexual harassment claim; "While we do not preclude the possibility of a single-incident hostile-work environment claim based on exclusively verbal conduct, successful single-incident claims typically have involved unwanted physical contact"). The Plaintiff's assertion that his "work environment became uncomfortable and hostile and [he] felt unsupported by the Department's leadership" because Burke was not disciplined, *see* #41-3 ¶¶ 13-14, if it adds anything to the analysis, adds too little. "[D]iscomfort is not the test." *Ponte*, 741 F.3d at 320.

[20] The court must consider all the circumstances including the frequency of the allegedly discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *See Ponte v. Steelcase, Inc.*, 71 F.3d 310, 320 & n. 9 (1st Cir. 2014) (sexual harassment claim).

In seeking summary judgment, *see* #41-1, the Plaintiff fails to address Burke's supervisory status for the purpose of holding the City strictly liable for Burke's conduct, or in the absence of proof of Burke's supervisory status, that the City was negligent in investigating the heritage discrimination. *See Savage v. City of Springfield*, --- F.4th ----, 2026 WL 2731181, at *13 (1st Cir. Sept. 16, 2026) (a "supervisor" for purposes of vicarious liability under Chapter 151B "must be someone with actual ability to exercise supervisory powers over a victim, not just a person with general supervisory status that has no such reach….If alleged harassers do not have sufficient supervisory authority over a given plaintiff, they are treated as coworkers and the employer is subject to a 'negligence' standard of liability…. Under that standard, an employer may be held liable for harassment by a coworker only if the employer knew or should have known about the harassment but failed to take prompt action to stop it") (citing *Noviello v. City of Boston*, 398 F.3d 76, 95-96 (1st Cir. 2005), *abrogated on other ground by Stratton v. Bentley Univ.*, 113 F.4th 25 (1st Cir. 2024)). The court is not persuaded by the Plaintiff's argument in opposing summary judgment that Burke's deposition testimony, *see* #51 at 4 (citing #43-1, presumably, at 5-6), proves his supervisory status. Burke did not testify that he had the authority to hire, fire, demote, promote, transfer, or discipline the Plaintiff. *See* #43-1 at 5-6; *see also Noviello*, 398 F.3d at 96 ("Having in mind both common law agency principles and the purposes of the anti-discrimination and anti-retaliation laws,…the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment…. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline….") (cleaned up) (citation omitted).

Regardless, there is no evidence that any harassment occurred between the August 20, 2019 incident and the investigation.[21] And it is undisputed that Burke had no contact with the Plaintiff after he apologized. (#50-1 ¶ 15; #51-1 ¶ 9.) The Plaintiff's assertion in opposing summary judgment that "inaction allowed the conduct to persist" is not supported by citation, *see* #50 at 6, or the record.

Finally, if the Plaintiff is relying on the initiation of involuntary retirement proceedings as the anchor for the heritage discrimination claims (he does not appear to be),[22] the court notes that "'to invoke [the continuing violations] doctrine, [a plaintiff] must show at a bare minimum a series of discriminatory acts that emanate from <u>the same discriminatory animus</u>.'" *Rae*, 113 F.4th at 104 (emphasis in original) (second alteration by this court) (quoting *Noviello*, 398 F.3d at 87). The initiation of involuntary retirement proceedings is alleged to have emanated from an intent to discriminate based on the Plaintiff's disability, not his Italian heritage. The initiation of involuntary retirement proceedings is also alleged to have emanated from an intent to retaliate. However, "retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice." *Noviello*, 398 F.3d at 87.

3. <u>The disability discrimination and retaliation claims based on the denial of disability benefits are not time-barred</u>.

Concerning the denial of disability benefits in August 2017, the Plaintiff clearly knew about this alleged incident of disability discrimination before September 6, 2017; it is apparently

[21] *See* #41-4 at 23 (¶ 38) (Burke's admission that he and the Plaintiff "avoided each other until 2-2½ months later").

[22] The initiation of involuntary retirement proceedings occurred on December 18, 2020, *see* #46-19; it is the only incident of alleged discrimination and retaliation that occurred within both a 300-day and a three-year statute of limitations.

the Plaintiff's belief that his complaint to Mayor DeMaria resulted in Chief Mazzie's denial being overturned, and the subsequent approval of benefits. (#43-4 at 3); *see also* #46-3. September 6, 2017, is more than 300 days before the Plaintiff filed his MCAD complaint and more than three years before he filed suit.

Concerning the refusal to indemnify the appointment with Dr. Curtis, the Plaintiff knew or should have known about this alleged incident of disability discrimination and retaliation around September 1, 2020, the date of Chief Mazzie's letter. That date falls within a 300-day limitations period but outside a three-year limitations period.

The court, however, declines to find the discrimination and retaliation claims based on the denial of disability benefits time-barred. The disability discrimination claim based on the initiation of involuntary retirement proceedings could anchor a disability discrimination claim based on the denial of disability benefits in August 2017, as the claims are alleged to emanate from the same discriminatory animus. Similarly, the disability discrimination and retaliation claims based on the initiation of involuntary retirement proceedings could anchor disability discrimination and retaliation claims based on the refusal to indemnify medical expenses between June and September 2020, as the claims are alleged to emanate from the same discriminatory and retaliatory animus.

B. <u>The Disability Discrimination and Retaliation Claims.</u>

1. <u>The disability discrimination claims fail on the merits</u>.

Count I arises under § 4(16) of Chapter 151B. Count IV arises generally under the ADA, and the court will assume that it arises under both Title I, governing disability discrimination by employers, and Title II, governing disability discrimination by public entities. The court will also assume that a Title II claim is cognizable. *See supra*.

a. Initiation of involuntary retirement proceedings.[23]

Concerning the disability discrimination claims based on the initiation of involuntary retirement proceedings, no extended discussion is needed. The Title I and § 4(16) claims fail as a matter of law because no reasonable jury could find that the Plaintiff was a "qualified individual" within the meaning of Title I or a "qualified handicapped person" within the meaning of § 4(16) at the time the involuntary retirement proceedings were initiated.[24] Title I prohibits an employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment," *see* 42 U.S.C. § 12112(a), and defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires," *see* 42 U.S.C. § 12111(8). Three of the Plaintiff's providers wrote letters dated October 19 and October 21, 2020, asserting that the Plaintiff was unable to, or at least should not, return to work as a police officer. (#46-15; #46-16; #46-17.) In his briefing, the Plaintiff concedes that by October 2020, he was no longer able to perform the essential functions of a police

[23] The court acknowledges the City, the EPD, and Chief Mazzie's argument that the initiation of involuntary retirement proceedings was not an "adverse employment action," *see* #46 at 7-8, 10-11, but it only needs to address that argument as it relates to the retaliation claim, *see supra*, because the Chapter 151B disability discrimination and ADA claims fail regardless.

[24] Previously, § 4(16) used the phrase "qualified handicapped person," defined in § 1(16) as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap." *See* Mass. Gen. Laws ch. 151B, § 1(16) (eff. September 24, 2014 to March 22, 2025); Mass. Gen. Laws ch. 151B, 4(16) (eff. May 30, 2023, to September 11, 2024). Presently, § 4(16) uses the phrase "qualified person with a disability." *See* Mass. Gen. Laws ch. 151B, §§ 1(16), 4(16) (eff. June 12, 2026). The First Circuit has applied the "qualified individual" analysis under Title I to the determination of whether a plaintiff was a "qualified handicapped person" under Chapter 151B. *Mulloy v. Acushnet Co.*, 460 F.3d 141, 154 (1st Cir. 2006).

officer and does not argue that a jury could find that a reasonable accommodation would have allowed him to perform those functions after October 2020. (#50 at 5.)[25] Involuntary retirement proceedings were initiated in December 2020, when the Plaintiff was, indisputably and concededly, not a "qualified individual." *See Sullivan v. Raytheon Co*., 262 F.3d 41, 47 (1st Cir. 2001) (affirming the entry of summary judgment for the employer as the plaintiff did not explain why his past representations of total disability were consistent with his current claim that he could perform the essential functions of a security guard with reasonable accommodation).

A Title II claim based on the initiation of involuntary retirement proceedings would fail for the same reason. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Qualified individual with a disability" means

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in program or activities provided by a public entity.

42 U.S.C. § 12131(2). Again, in his briefing, the Plaintiff concedes that by October 2020, he was no longer able to perform the essential functions of a police officer. And he does not argue that a jury could find that reasonable modifications to rules, policies, practices, etc. would have allowed him to meet the essential eligibility requirements for the receipt of services, etc.

b. Denial of disability benefits.

---

[25] In response to the "qualified individual" argument, the Plaintiff seems to narrow his claims to claims based on the denial of disability benefits. *See id*.

The City, the EPD, and Chief Mazzie argue that there is insufficient evidence of a causal connection between the denial of benefits and the Plaintiff's disability. (#46 at 12-13.)[26, 27] In response, the Plaintiff reverses the chronology of events, implying that Chief Mazzie received the letters from Drs. Binder and Ketro and Ms. Tetreault and "[d]espite this," denied the request for indemnification related to the appointment with Dr. Curtis, "citing lack of documentation." *See* #50 at 3 (first citing #46-17, then citing #46-14). In reality, Chief Mazzie received these letters, written October 19 and 21, 2020, many weeks after denying that request, on September 1, 2020. *See* #46-14; *see also* ##46-15, 46-16, 46-17.

Nor, on this record, is it apparent why these letters would have warranted reconsideration of the denial of the indemnification request related to the appointment with Dr. Curtis. According to Chief Mazzie, Dr. Curtis referred to the February 2015 shoulder injury and the City's records showed that that injury was treated with surgery and fully healed and the Plaintiff was not receiving

[26] The *McDonnell Douglas* framework is used to evaluate claims under the ADA and § 4(16). *See Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 81-82 (1st Cir. 2019). The court assumes that the Plaintiff has satisfied his burden at the first stage. The City, the EPD, and Chief Mazzie have satisfied their burden at the second stage. Chief Mazzie wrote with respect to the indemnification request related to the appointments with Ms. Tetreault and Dr. Binder that "[t]o date [he did] not have any information…," *see* #46-13 at 2, and then with respect to the indemnification request related to the appointment with Dr. Curtis that "[a]t this time [he had] found no factual or medical specifics…," *see* #46-14 at 2. At the third stage, it is the Plaintiff's burden to produce evidence of the causal connection between his disability and these refusals to indemnify, which he may satisfy by producing evidence of pretext. *See Miceli*, 914 F.3d at 82.

[27] The defense argument is based on the exchange during the Plaintiff's deposition testimony in which he was asked whether he alleges that Chief Mazzie treated him differently because of his disability, and the Plaintiff answered that Chief Mazzie "picked on a lot of people" and "he just tried to deny anybody except for his friends." (#46 at 13) (quoting #46-5 at 7.) The court doubts that the Plaintiff's opinion as to Chief Mazzie's state of mind would be admissible at trial. *See Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998) ("Evidence that is inadmissible at trial…may not be considered on summary judgment"). But it is noteworthy that the Plaintiff had the chance to identify the basis for an opinion as to Chief Mazzie's state of mind and did not do so cogently. (#46-5 at 8.)

ongoing treatment. (#46-14 at 2.) Dr. Binder wrote in his letter about treatment for "neck and lower back pain," *see* #46-16, as did Ms. Tetreault in her letter, *see* #46-17. Dr. Ketro claimed that the Plaintiff was unable to return to work as a police officer because of his March 2017 injury; he did not mention the Plaintiff's February 2015 injury. (#46-15.)

There is likewise insufficient evidence of a causal connection between Chief Mazzie's denial of benefits in August 2017 and the Plaintiff's disability. As to this incident, too, the court assumes that the Plaintiff has satisfied his burden at the first stage. The City, the EPD, and Chief Mazzie have satisfied their burden at the second stage. On August 23, 2017, Chief Mazzie wrote that the Plaintiff did not seek medical attention after the March 2017 fall and did not request "injured on duty" leave without loss of pay for five months and in that span he worked regular hours of duty, details and overtime, exercised, and traveled. (#46-1 at 5.) Thus Chief Mazzie found that the Plaintiff was not "incapacitated" within the meaning of Mass. Gen. Laws ch. 41, § 111F. That this request was subsequently approved, according to the Plaintiff, after he complained to Mayor DeMaria, *see* #43-4 at 3, is not sufficient evidence that the facially legitimate reason is pretext.

Likewise, if in fact Chief Mazzie said, around July 2020: "the City should not have approved [the Plaintiff's] injury," *see* #46-13 at 3 (capitalization normalized),[28] this remark is at best ambiguous and is not sufficient evidence that the facially legitimate reason is pretext.

---

[28] The Plaintiff has not attested that Chief Mazzie made this statement. *See* #41-3; *see also* #43-4 at 3-4.

2. The retaliation claim fails on the merits.

A claim for retaliation under Chapter 151B, § 4(4), may succeed when the underlying claim for discrimination fails. *See Robinson v. Town of Marshfield*, 278 N.E.3d 823, 836, 837 (Mass. 2026); *see also Verdrager*, 50 N.E.3d at 800. To survive summary judgment on a retaliation claim, an employee must produce evidence from which a reasonable jury may infer: that he reasonably and in good faith believed that the employer was engaged in wrongful discrimination; that he acted reasonably in response to that belief, through reasonable acts meant to protest or oppose the discrimination (protected activity); that the employer took an adverse action against him; and that the adverse action was a response to his protected activity (forbidden motive). *Verdrager*, 50 N.E.3d at 800.[29]

As in the discrimination context, in the retaliation context, employees may rely on circumstantial evidence to prove forbidden motive, which is evaluated by courts using the *McDonnell Douglas* framework. *Id*. At the first stage, an employee has the burden of producing evidence that he engaged in protected conduct, that he suffered some adverse action, and that a causal connection existed between the protected activity and the adverse action. *Id*. The burden of production shifts to the employer at the second stage to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id*. At the third stage, the burden of production shifts back to the employee to produce evidence that the employer's facially legitimate reason for the adverse employment action is not true but a pretext. *Id*.; *see also Robinson*, 278 N.E.3d at 838.

a. The Plaintiff has produced direct evidence of forbidden motive as to the initiation of involuntary retirement proceedings but not as to the refusal to indemnify medical expenses, and there is insufficient evidence that the facially legitimate reason for denying this disability benefit is pretext.

[29] The City, the EPD, and Chief Mazzie argue that the Plaintiff did not engage in protected activity. *See* #46 at 15-16. The court does not need to address this argument.

The City, the EPD, and Chief Mazzie's argument that as to the retaliation claim, the Plaintiff cannot satisfy his burden at the third stage, *see* #46 at 9-10, overlooks that the Plaintiff has produced evidence that Chief Mazzie said: "Yep, you made your bed, now sleep in it," around the time that Chief Mazzie "ordered [the Plaintiff] to involuntarily retire rather than allow [him] to retire due to disability," when the Plaintiff asked "if [Chief Mazzie] was doing this to [him] because [he] had complained to the mayor about [his] disability claims and Burke's slurs." (#43-4 at 3-4). Concerning the initiation of involuntary retirement proceedings, this is direct evidence of a forbidden motive. To be sure, a reasonable jury could credit Chief Mazzie's denial that this occurred, *see* #41-4 at 44 (¶ 94), but on a summary judgment motion, the court does not make credibility determinations. *Velez Gomez v. SMA Life Assure. Co.*, 8 F.3d 873, 877 (1st Cir. 1993).

On the other hand, the alleged "now sleep in it" statement is not direct evidence of forbidden motive as to the refusal to indemnify expenses between June and September 2020. The Plaintiff described the statement as related to the initiation of involuntary retirement proceedings, not the refusal to indemnify. *See* #43-4 at 3-4.

Under the *McDonnell Douglas* framework, the court finds that the Plaintiff has not satisfied his burden to produce evidence that the facially legitimate reason for the refusal to indemnify expenses between June and September 2020, that is, the lack of documentation, *see* #46-13 at 2; #46-14 at 2, is pretext. The Plaintiff has not produced competent evidence that he supplied Chief Mazzie with sufficient documentation. The record does not reveal that the Plaintiff responded to Chief Mazzie's request on July 11, 2020, *see* #46-13 at 2, for additional documentation before September 1.

The Plaintiff relies on the alleged temporal proximity between his complaint to Mayor DeMaria about Burke's use of the slur, around November 2019, and the refusal to indemnify, from

June to September 2020. *See* #50 at 4-5. But at the third stage, a months-long gap is insufficient, particularly where a plaintiff's unprotected activity explains the alleged temporal proximity between his protected activity and the adverse employment action. *See, e.g.*, *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 121 (1st Cir. 2024) (affirming grant of summary judgment for the employer on the retaliation claim under the ADA; "The mere fact that Rios was terminated less than two months after engaging in protected conduct would not, in light of all the other evidence in the record to the contrary, allow a reasonable jury to infer that Centerra's reason for firing Rios was pretextual") (citing, *inter alia*, *Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 138 (1st Cir. 2017) (same despite one-day gap)); *see also Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 179 (1st Cir. 2015) (the plaintiff did not satisfy her burden on the third stage based the two-month gap alone where the timing of the threats to fire her "ma[de] sense" because they occurred soon after she returned to work from surgery when her sales numbers were low).

b. <u>The Plaintiff has failed to produce evidence that the initiation of involuntary retirement proceedings materially disadvantaged him</u>.

Finally, as to the initiation of involuntary retirement proceedings, the court turns to the City, the EPD, and Chief Mazzie's argument that the Plaintiff has not produced evidence from which a reasonable jury could infer that he was subjected to an adverse employment action. *See* #46 at 7-8, 10-11. On a Chapter 151B retaliation claim, the employee bears the burden of establishing that he was subjected to an adverse employment action. *MacCormack v. Boston Edison Co.*, 672 N.E.2d 1, 7 (Mass. 1996) (affirming judgment notwithstanding the verdict in favor of the employer). The action must have "materially disadvantaged" the employee. *Id.* at 8; *see also Yee v. Massachusetts State Police*, 121 N.E.3d 155, 162 (Mass. 2019); *accord City of Newton v. Commonwealth Employment Relations Bd.*, 258 N.E.3d 1114, 1124-1125 (Mass. 2025) (under Mass. Gen. Laws. ch. 151B, §§ 10(a)(1), (3)). "Material disadvantage for this purpose arises when

objective aspects of the work environment are affected.'…The disadvantage must be objectively apparent to a reasonable person in the employee's position; 'subjective feelings of disappointment and disillusionment will not suffice." *Yee*, 121 N.E.3d at 162 (first quoting *King v. Boston*, 883 N.E.2d 316, 323 (Mass. App. Ct. 2008), then quoting *MacCormack*, 672 N.E.2d at 8).[30]

Noting that the City's application for involuntary superannuation retirement was denied after the Plaintiff objected, and that the Plaintiff subsequently filed an application for voluntary superannuation retirement and his application for disability retirement was later granted, *see* #50-1 ¶¶ 24-25, 27-29; *see also* ##46-2, 46-20, 46-21, the City, the EPD, and Chief Mazzie argue that the City's application was a mere proposal, and mere proposals are not adverse employment actions. To be an adverse employment action, a proposal must come to fruition. (#46 at 8) (citing *Ahern v. Shinseki*, 629 F.3d 49, 56 (1st Cir. 2010)).

The City, the EPD, and Chief Mazzie also argue that even if the City's application had been granted, the Plaintiff could have applied for and received disability retirement; that is, allowance of the City's involuntary superannuation retirement application would not have posed a legal impediment to the Plaintiff's retirement due to disability. (#46 at 10-11) (citing *Retirement Bd. of Andover v. Contributory Retirement Appeal Bd.*, 448 N.E.2d 412, 412 (Mass. App. Ct. 1983) (rescript)).

[30] Under federal law, adverse employment actions in the discrimination context are limited to actions affecting "compensation, terms, conditions, or privileges of employment," but in the retaliation context, the challenged actions need only have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe R.R. v. White*, 548 U.S. 53, 60 (2006). The showing required under *Burlington North* is a lesser showing than that required in the discrimination context. *See King*, 883 N.E.2d at 327, n. 11. Most recently, the SJC in *Yee* declined to reach the question of whether to apply a different standard to define "adverse employment action" in the discrimination context under Chapter 151B, compared to the retaliation context under Chapter 151B, *see Yee*, 121 N.E.3d at 163, n.8, and the SJC has not reached the question since.

The Plaintiff responds that the adverse employment action question is answered on a "case-by-case" basis. (#50 at 3-4.) That is true. *See Yee*, 121 N.E.3d at 162. But courts have granted summary judgment for the employer when the employee has not produced evidence from which a reasonable jury could infer that he was subjected to an adverse employment action. *See*, *e.g.*, *Rodríguez-Severino v. UTC Aerospace Sys.*, 52 F.4th 448, 463-64 (1st Cir. 2022) (Title VII); *Bhattti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011) (Title VII and 42 U.S.C. § 1981).

Nevertheless, the court is not convinced that the circumstances in *Ahern* are comparable to the circumstances here. In *Ahern*, the employees objected to the proposed change from a four- to a five-day work schedule, and it was undisputed that the proposal was never implemented. *See Ahern v. Shinseky*, #05-cv-117-ML, 2009 WL 1615402, at *11, *16 (D.R.I. June 9, 2009) (Almond, M.J.), *report and recommendation adopted*, *id*. *1-9 (Lisi, D.J.). But it is not clear that those employees in objecting to that proposed schedule change took actions similar to the actions that the Plaintiff took to ensure that the involuntary retirement proposal was not implemented, that is, objecting through an attorney to the City's application, requesting a private board hearing, and on reinstatement and exhaustion of additional sick and vacation time, submitting his application and counseled amendment.

Ultimately, however, the court finds that the Plaintiff has not produced evidence of more than "subjective feelings of disappointment and disillusionment," which are not enough. *See Yee*, 121 N.E.3d at 162; *see also MacCormack*, 672 N.E.2d at 8. The test is objective, but the Plaintiff might have attested to the inconvenience or expense associated with his objection, the hearing, and the subsequent filings. He did not, *see generally* #41-3; *see also* #43-4 at 3-4, and if he testified to inconvenience and expense at his deposition, the excerpts have not been made part of the summary

judgment record. *Contrast City of Newton*, 258 N.E.3d at 1125 (the police officer's testimony that the post-transfer schedule interfered with his family life supported the finding that, from an objective perspective, the transfer "materially disadvantaged" him).

The Plaintiff might also have produced evidence regarding the City's practice as to involuntary retirement proceedings. He did not. *Contrast King*, 883 N.E.2d at 325 (in reversing entry of summary judgment for the police department, noting evidence that it had provided rank-specific locker rooms for decades); *contrast also Yee*, 121 N.E.3d at 165 (evidence from which a reasonable jury could infer that the single comparator, who had been assigned to Troop H, then Troop F, then Troop H, earned more overtime and detail pay while assigned to Troop F because of the greater opportunities for earning overtime and detail pay in Troop F was sufficient to survive summary judgment). The retaliation claim based on the initiation of involuntary retirement proceedings fails on the merits.

3. Chief Mazzie is immune from liability on the negligent infliction of emotional distress claim and as to the City and the EPD, the Plaintiff did not satisfy the presentment requirement.

Under the MTCA, public employees are immune from negligence claims as long as they were acting within the scope of their employment; the exclusive remedy for the negligence of a public employee within the scope of his employment is a claim against the public employer under the MTCA. Mass. Gen. Laws ch. 258, § 2; *see Caisse v. DuBois*, 346 F.3d 213, 218 (1st Cir. 2003) (citing *McNamara v Honeyman*, 546 N.E.2d 139, 141-42 (Mass. 1989)); *see also Pettengill v. Curtis*, 584 F. Supp. 2d 348, 362 (D. Mass. 2008).[31] The factors relevant to the scope of employment determination are whether the conduct at issue is the kind the employee was hired to

[31] This is immunity from personal liability; a suit against a police department or its chief in his official capacity is deemed to be a suit against the city itself. *Doe v. Fournier*, 851 F. Supp. 2d 207, 224 (D. Mass. 2012).

perform; whether the conduct occurred within authorized time and space limits; and whether the conduct was motivated by a purpose to serve the employer. *Merlonghi v. United States*, 620 F.3d 50, 55 (1st Cir. 2010) (quoting *Clickner v. City of Lowell*, 663 N.E.2d 852, 855 (Mass. 1996)). The Plaintiff develops no argument that Chief Mazzie was not acting within the scope of his employment when he denied disability benefits or initiated involuntary retirement proceedings, *see* #50, and it appears that each of the factors is satisfied as to each of his actions.

The City and the EPD argue that the Plaintiff did not satisfy the MTCA's presentment requirement. (#46 at 18-19.) Under the MTCA, a plaintiff must "present[] his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose…." Mass. Gen. Laws ch. 258, § 4. The purpose of the MTCA's presentment requirement is to ensure that the responsible public official receives adequate notice of the claim so that that official can investigate to determine whether the claim is valid and if it is, to settle the claim quickly; to avoid unwarranted payment; and to take steps to ensure that similar claims will not be brought in the future. *Rodriguez v. City of Somerville*, 33 N.E.3d 1240, 1244 (Mass. 2015); *see Firmin v. City of Boston*, #1:19-cv-12158-ADB, 2021 WL 352376, at *3 (D. Mass. Feb. 2, 2021). As to whether the written claim was presented to the proper executive and in a timely fashion, "strict compliance" with the presentment requirement is a prerequisite to recovery. *Martin v. Commonwealth*, 760 N.E.2d 313, 316 (Mass. App. Ct. 2002); *see Firmin*, 2021 WL 352376, at *3.

The Plaintiff argues that the presentment question is one of fact for a jury and he provided adequate written notice of claims through his MCAD complaint. (#50 at 6.)[32] The City and the

---

[32] The Plaintiff also argues that the written statement he provided to Chief Mazzie satisfied this requirement, *see id.*; that statement concerned his issues with Burke and preceded the denial of the

EPD rely on *Silva v. Town of Uxbridge*, 771 F. Supp. 3d 56 (D. Mass. 2025), *see* #46 at 18, however, and the court therefore presumes that their argument is that presentment was not made to the proper executive officer. In *Silva*, the court entered summary judgment for the town, finding that the former student's presentment to the school superintendent was not sufficient. In so finding, the court observed that the superintendent was the employee of the school committee of the town but the public employer for purposes of the MTCA was the town. *Id.* at 73-74 (applying *Doe v. Cambridge Pub. Schs.*, 194 N.E.3d 217, 221 (Mass. App. Ct. 2022). It is the City and the EPD's burden to show that presentment was not made to the proper executive officer, *see Fournier*, 851 F. Supp. 2d at 223-24, but, the court notes, the Plaintiff does not respond to this argument. (#50 at 6.)

The MCAD complaint identified the "employer…who discriminated against" the Plaintiff as "Everett Police Department Human Resources," *see* #43-4 at 3, and MCAD's "SERVICE OF COMPLAINT AND NOTICE OF INVESTIGATIVE CONFERENCE" was likewise addressed to "Everett Police Department Human Resources," *see id.* at 2. The record does not reveal whether the "Everett Police Department Human Resources" received the MCAD complaint or, more importantly, whether it was served on any other person or entity. *See Doe*, 194 N.E.3d at 223 (presentment requirement may be excused if the plaintiff can show that notwithstanding defective presentment, the proper executive officer had actual notice of the written claim).

The court finds there is no genuine factual dispute that the Plaintiff's MCAD complaint was not presented to the proper executive officer. Mass. Gen. Laws ch. 258, § 1, defines "executive officer of a public employer" to include "the mayor of a city, or as designated by the charter of the

request for indemnification related to the appointment with Dr. Curtis and the initiation of involuntary retirement proceedings.

city." *Id*. Mass. Gen. Laws ch. 258, § 4, provides that in the case of a city or town, presentment of the written claim shall be deemed sufficient if presented to the "mayor, city manager, town manager, corporation counsel, city solicitor, town counsel, city clerk, town clerk, chairman of the board of selectmen, or executive secretary of the board of selectmen." *Id*. There is no evidence that the "Everett Police Department Human Resources" was any of the officials listed in the MTCA or that the "Everett Police Department Human Resources" was designated by the city's charter as its executive officer.

4. <u>The 42 U.S.C. § 1983 claim fails</u>.

Opposing summary judgment on Count VII, the Plaintiff argues that even if a statute's remedial scheme is the exclusive avenue through which a plaintiff may claim the deprivation of the statutory right, 42 U.S.C. § 1983 is the avenue through which a plaintiff may claim the deprivation of a constitutional right. (#50 at 6.) The Plaintiff does not then specify the relevant constitutional right, *see id.*, but in his motion for partial summary judgment, he asserts genuine factual disputes as to whether the Defendants "acted under the color of law to deprive [him] of equal protection." (#41-1 at 4.)

The court declines to consider unspecified constitutional rights. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("A party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly, or else forever hold his peace.... The district court is free to disregard arguments that are not adequately developed....") (citations omitted).

The equal protection claim fails. The Plaintiff has produced no evidence in support of a disparate treatment theory. *See Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011) (the plaintiff must "identify his putative comparators"). And a class-of-one theory is not cognizable in

the public employment context. *See Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 606 (2008) (as "contrary to the concept of at-will employment. … To be sure, Congress and all the States have, for the most part, replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons…. But a government's decision to limit the ability of public employers to fire at will is an act of legislative grace, not constitutional mandate").

5. <u>The City and the EPD are immune from liability on the civil conspiracy claim and the court is inclined to enter summary judgment for Chief Mazzie sua sponte</u>.

Under the MTCA, a public employer is immune from liability for the intentional torts of its employees, *see* Mass. Gen. Laws ch. 258, § 10(c), and civil conspiracy based on intentionally tortious conduct is an intentional tort within the meaning of the MTCA. *Caldwell v. Cambra*, 802 F. Supp. 3d 8, 47 (D. Mass. 2025) (citing *Shaoguang Li v. Office of Transcription Srvcs*., 63 N.E.3d 64, 2016 WL 6609796, at *1 (Mass. App. Ct. Nov. 8, 2016) (unpublished); *Cruthird v. Keefe Commissary Network*, 5 N.E.3d 969, 2014 WL 1325657, at *1 & n. 5 (Mass. App. Ct. Apr. 4, 2014) (unpublished)). The City and the EPD argue that they are immune from liability for the civil conspiracy alleged. (#46 at 19.) In opposition, the Plaintiff does not address the civil conspiracy claim. *See* #50. The court agrees with the City and the EPD that they are immune.

That leaves a civil conspiracy claim against Chief Mazzie in his individual capacity.[33, 34] The Plaintiff makes three allegations in his complaint. He alleges Chief Mazzie approached the Union President and told him that he was not going to support the Plaintiff's receipt of disability coverage because the Plaintiff had circumvented him and gone to Mayor DeMaria and then the Plaintiff attempted to call the Union Attorney but his calls were ignored. (#1-1 ¶¶ 28-29, 112.) The Plaintiff has produced no evidence in support of this allegation.

The Plaintiff also alleges in his complaint that when he asked Mayor DeMaria for help with disability payments, "no action was taken other than instructing Chief Mazzie to take care of it." *Id.* ¶ 111. This specific allegation is belied by the Plaintiff's other allegations and the evidence. It is simply not true that "no [other] action was taken." The request for disability benefits in August 2017 was ultimately approved. *See* #1-1 ¶ 17; *see also* #50-1 ¶ 5; #46-3 at 3-4.

Finally, the Plaintiff alleges in his complaint that Chief Mazzie "continually denied [the Plaintiff] disability coverage" even though Chief Mazzie had proof that the Plaintiff's injuries were related to his job. (#1-1 ¶ 110.) As for the August 2017 request for leave without loss of pay, the

---

[33] In addition to arguing that the civil conspiracy claim is time-barred, *see* #46 at 6-7, Chief Mazzie argues that such a claim cannot be brought against "a public employee acting within the scope of his duty." *Id.* at 19. As already explained, however, a suit against a police department chief in his official capacity is deemed to be a suit against the city itself, *see Fournier*, 851 F. Supp. 2d at 224, and a city is immune from liability for civil conspiracy based on intentionally tortious conduct, *see Caldwell*, 802 F. Supp. 3d at 47. A public employee can be personally liable for an intentional tort. *Nelson v. Salem State Coll.*, 845 N.E.2d 338, 348 (Mass. 2006). Chief Mazzie does not address the merits of the civil conspiracy claim.

[34] There are two theories of civil conspiracy under Massachusetts law. *Greene v. Philip Morris USA Inc.*, 208 N.E.3d 676, 682 (Mass. 2023). The "concerted action" theory applies to a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to bring about the result. *Id.* To prevail on the other, "true conspiracy" theory, a plaintiff must prove that alleged co-conspirators agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means and caused harm to the plaintiff via "some peculiar power of coercion" that they would have had had they been acting independently. *Id.* at 685, n.10.

issue was not merely whether the Plaintiff's injuries were job related; the issue was also whether the Plaintiff was "incapacitated." Mass. Gen. Laws ch. 41, § 111F.

The court discussed above the issues with a claim based on the denial, in September 2020, of the request for indemnification related to the appointment with Dr. Curtis. The problem is that the letters that the Plaintiff argues supported that request, *see* 50-1 ¶ 20, were not submitted to Chief Mazzie until mid-October 2020, and it is not apparent why they would have warranted reconsideration in any event.

The court is inclined to enter summary judgment for Chief Mazzie on the civil conspiracy claim against him sua sponte. *See* Fed. R. Civ. P. 56(f)(3) ("[a]fter giving notice and a reasonable time to respond," a district court "may…consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute"). The Plaintiff, by November 13, 2026, must file a memorandum and any other supporting materials identifying evidence raising a triable issue of fact on this claim. Chief Mazzie may file a response by November 20, 2026, although he does not have to. If the Plaintiff does not file the memorandum and supporting materials or if the court finds that the identified evidence does not raise a triable issue of fact, it will enter summary judgment for Chief Mazzie on the civil conspiracy claim against him sua sponte, thus entering summary judgment for the defense on all claims in this case.

VI. Conclusion and Order.

For the reasons explained above, the Plaintiff's motion for summary judgment on Count II only (#41) is denied and Burke's motion for summary judgment on all counts against him, II, VI, and VII, (#42) is allowed.

The court allows the City, the EPD, and Chief Mazzie's motion for summary judgment (#45) as to Counts I through VII and Count VIII against the City and the EPD.

The court will enter summary judgment for Chief Mazzie on Count VIII against him sua sponte unless, by November 13, 2026, the Plaintiff identifies evidence raising a triable issue of fact on that civil conspiracy claim.

October 30, 2026

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge